IN THE SUPERIOR COURT

**FILED**

April 13, 2020

TAMARA CHARLES
CLERK OF THE COURT

)FFICIAL PUBLICATION

**SUPERIOR COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| IN RE: CATALYST THIRD-PARTY LITIGATION. | ) MASTER CASE NO. SX-05-CV-799 |
| | ) COMPLEX LITIGATION DIVISION |
| _____ | ) |
| | ) |
| LEANDRE AARNDEL, | ) CASE NO. SX-05-CV-799 |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HESS OIL VIRGIN ISLANDS CORPORATION; AMERADA HESS CORPORATION; LITWIN CORPORATION; SHELL OIL CORPORATION; UOP, LLC; and AMERICAN CYANAMID, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| | ) |
| HESS OIL VIRGIN ISLANDS CORPORATION and HESS CORPORATION f/k/a AMERADA HESS CORPORATION, | ) |
| | ) |
| Defendants / Third-Party Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| CROSFIELD; AXENS NORTH AMERICA, individually and as successor-in-interest to ACREON CATALYSTS; HALDOR TOPSOE; JOHNSON MATTHEY, INC., individually and successor-in-interest to KATALCO CORPORATION; KATALCO CORPORATION; CRITERION; ABLEMARLE CORPORATION, as successor-in-interest to AKZO NOBLE N.V.; CATALEASCO, INC.; VIRGIN ISLANDS INDUSTRIAL MAINTENANCE CORPORATION; RIGGERS & ERECTORS INTERNATIONAL, INC.; RIGGERS & ERECTORS VIRGIN ISLANDS CORPORATION; COMMUNICATIONS SYSTEMS & MAINTENANCE CORPORATION; AKZO NOBEL N.V.; and AKZO NOBEL POLYMER CHEMICALS, LLC, | ) |
| | ) |
| Third-Party Defendants. | ) |
| _____ | ) |

Cite as: 2020 VI Super 52

**Appearances:**

**THOMAS ALKON, ESQ.**
Law Office of Thomas Alkon, P.C.
Christiansted, VI 00820
*For Plaintiff*

**CARL A. BECKSTEDT III, ESQ.**
Beckstedt & Associates
Christiansted, VI 00820
*For Hess Oil Virgin Islands Corporation and Hess Corporation*

**KEVIN A. RAMES, ESQ.**
Law Offices of K.A. Rames, P.C.
Christiansted, VI 00820
*For Shell Oil Company*

**RICHARD H. HUNTER, ESQ.**
Hunter & Cole
Christiansted, VI 00820
*For UOP, LLC*

**BERNARD C. PATTIE, ESQ.**
Law Offices of Bernard C. Pattie, P.C.
Christiansted, V.I. 00820
*For American Cyanamid Company*

**CAROL G. HURST, ESQ.**
Carol G. Hurst, P.C.
St. Thomas, VI 00802
*For Axens North America, Inc.*

**J. DARYL DODSON, ESQ.**
Moore, Dodson & Russell, P.C.
St. Thomas, VI 00804
*For Haldor Topsoe, Inc.*

**MARK W. ECKARD, ESQ.**
5030 Anchor Way
Gallows Bay, VI 00824
*For Ablemarle Corporation*

**MICHAEL J. SANFORD, ESQ.**
**THOMAS KRAEGER, ESQ.**
Sanford Amerling & Associates
Christiansted, VI 00820

*For Virgin Islands Industrial Maintenance Corporations, Riggers & Erectors International, Inc.,
and Riggers & Erectors Virgin Islands Corporation*

**SHARMANE DAVIS-BRATHWAITE, ESQ.**
Braithwaite Law, LLC
St. Thomas, VI 00802
*For Akzo Nobel, N.V. & Akzo Nobel Polymer Chemicals, LLC*

## MEMORANDUM OPINION

**MOLLOY,** *Judge.*

¶1    **BEFORE THE COURT** are the following: **(1)** a motion filed by Hess Oil Virgin Islands Corporation ("HOVIC") and Hess Corporation ("Hess") for summary judgment against Virgin Islands Industrial Maintenance Corporation ("IMC"); **(2)** a motion for leave to conduct discovery filed by IMC in response to Hess' and HOVIC's summary judgment motion; and **(3)** a motion for leave to file a second amended third-party complaint filed by Hess and HOVIC. For the reasons stated below, the Court will deny summary judgment without prejudice, grant leave to take discovery, and grant leave to amend but sever the third-party claims to be refiled separately. Additionally, because Hess and HOVIC's motion raises controlling questions of law not settled by binding precedent, the Court will certify the questions to the Supreme Court of the Virgin Islands. Lastly, because "a master case is not a true case, but rather a mechanism used to coordinate one or more aspects of litigation across a number of different cases," *In re: Alumina Dust Claims*, 67 V.I. 172, 196 n.17 (Super. Ct. 2017), the Court will direct the Clerk's office to assign a new case number to the individual case of *Leandre Aarndel v. Hess Oil Virgin Islands Corporation, et al.*, which was used as the master case, "[d]ifferent cases cannot share the same case number." *Id.* Given the quantity of papers filed in the master case, separating out the individual filings pertaining to Mr. Aarndel's case would be simpler.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

¶2    On December 28, 2005, eighty-four men filed separate lawsuits against HOVIC, Hess, Litwin Corporation ("Litwin"), Shell Oil Company ("Shell"),[1] UOP, LLC ("UOP"), and American Cyanamid Company in the Superior Court of the Virgin Islands. They sought damages, including punitive damages, for exposure to workplace dusts released from the chemical catalysts used at the St. Croix oil refinery between 1965 and 1998. *See In re: Catalyst Litig.*, 55 V.I. 20, 22 (Super. Ct. 2010) ("Plaintiffs filed th[ese] action[s] . . . alleging that they developed mixed dust

---

[1] Named "Shell Oil Corporation" in the complaints.

pneumoconiosis as a result of occupational exposure to catalyst at . . . HOVIC's refinery on St. Croix."). On February 2, 2006, an additional three lawsuits were filed with the same companies as defendants and the same claims and allegations. The Defendants appeared and answered the complaints. Litwin crossclaimed against Shell, UOP, and American Cyanamid and they crossclaimed against Litwin, all seeking the same relief – contribution and indemnification.

¶3      To coordinate pre-trial litigation and discovery, the Court (Cabret, J.), on August 21, 2006, granted a motion Plaintiff had filed on July 6, 2006 in *Leandre Aarndel v. Hess Oil Virgin Islands Corporation, et al.*, case number SX-05-CV-799, joined by Litwin on July 24, 2006, to approve a stipulated case management order.[2] The stipulated order directed the Clerk's Office to open a master case file and docket under the caption *In re: Catalyst Litigation*,[3] and consolidate the eighty-seven lawsuits under the master case. (*See* Stip. Case Mgmt Order 1, entered Aug. 21, 2006 (hereinafter "CMO") ("The Court shall create a master file and a master docket number for the cases listed in Schedule A which shall be caption[ed] *In re: Catalyst Litigation*, Master Docket No. SX-05-CV-799.").) The order did not direct the Clerk's Office to assign a new case number. Consequently, Mr. Aarndel's case number served as the master case.

¶4      During discovery, Hess and HOVIC filed a motion in the master case on December 31, 2008, for leave to file a third-party complaint.[4] The eighty-seven plaintiffs (collectively "Plaintiffs") responded in opposition on January 13, 2009, but asked in the alternative, if the motion was granted, that the Court sever the third-party litigation from the first-party litigation. HOVIC and Hess (hereinafter "Hess Defendants" in their capacity as first-party defendants, and "Hess Plaintiffs" in their capacity as third-party plaintiffs) opposed severance. Litwin and UOP did not oppose the third-party claims but did oppose severance. The Court (D'Eramo, J.) granted

---

[2] The motion was submitted to the attention of the Presiding Judge (Hodge, P.J.), presumably because coordination required reassignment from the other Superior Court judges. For reasons unclear from the record, the judge assigned to *Aarndel* granted the motion and approved the stipulated case management order.

[3] To distinguish between the first- and third-party actions, the Court (Willocks, J.), on December 12, 2016, ordered that all papers captioned *In re: Catalyst Litigation* would apply to the first-party litigation whereas all papers captioned *In re: Catalyst Third-Party Litigation* would apply to the third-party litigation.

[4] The proposed third-party complaint asserted six claims—contribution (two counts), common law indemnification, contractual indemnification, and breach of contract (two counts)—against the following companies: Kaiser Aluminum, W.R. Grace (in its individual capacity and successor capacity to Crosfield), Crosfield, Axens North America (in its individual capacity and successor capacity to Acreon Catalysts), Haldor Topsoe, Inc. ("HTI"), Johnson Matthey, Inc. (in its individual capacity and successor capacity to Katalco Corporation), Katalco Corporation, Criterion, Ablemarle Corporation (in its individual capacity and successor capacity to Akzo Nobel, N.V.), Cataleasco, Inc., IMC, Riggers & Erectors International, Inc., Riggers & Erectors Virgin Islands Corporation, and Communications Systems & Maintenance Corporation.

the motion on February 17, 2009, but reserved ruling on severance. The Hess Defendants filed their third-party complaint on February 20, 2009, in the *Aarndel / Catalyst Litigation* case, and under a dual caption.

¶5     IMC answered the third-party complaint on April 6, 2009, and demanded a jury trial. Two months later, on June 8, 2009, the Hess Plaintiffs moved for leave to amend to drop some third-party defendants and add others.[5] Again Plaintiffs responded, not in opposition, but to renew their request to sever. In granting leave to file a third-party complaint, the Court had also ordered the parties to identify four cases for trial at the end of 2009. If the first- and third-party claims were not severed, Plaintiffs argued, trial would have to be postponed as the third-party litigation had just begun. The Hess Defendants opposed, claiming "[n]either judicial economy nor convenience to the parties, witnesses, jurors, or the Court will be furthered . . . [by] severance." (Hess Defs.' Reply in Further Supp. of Mot. for Leave to File an Amend. Third-Party Compl. & in Opp'n to Pls.' "Renewed" Mot. to Sever 3, filed June 26, 2009.)

¶6     On October 9, 2009, the Court (Ross, J.) granted leave to amend and the request to sever the third-party litigation. The Court agreed with Plaintiffs that neither option was fair: delaying trial to give the third-party defendants time to prepare or forcing the third-party defendants to proceed to trial without having engaged in discovery. The Hess Plaintiffs filed the amended third-party complaint on October 16, 2009. Even though the Court severed the third-party litigation, Hess and HOVIC still filed their amended third-party complaint in the *Aarndel / Catalyst Litigation* case. Not as a new case. The Clerk's Office also did not assign a new case number. Technically, severance never occurred then. *Cf. Centon Elecs., Inc. v. Bonar*, 614 So. 2d 999, 1003 n.1 (Ala. 1993) ("Normally, a new case number should be assigned once a claim is severed from the main action."); *accord Multibank, Inc. v. Access Glob. Capital LLC*, 594 B.R. 618, 627 (Bankr. S.D.N.Y. 2018) ("It seems intuitive that if actions have truly been separated they should ordinarily be given different case numbers.").

¶7     For reasons not relevant to this Opinion, trial did not go forward in 2009.[6] And by 2010, Plaintiffs had resolved their claims against everyone except Hess and HOVIC. Stipulations were

---

[5] The proposed amended third-party complaint would have dropped Johnson Matthey, individually and as successor to Katalco Corporation, and added Akzo Nobel, N.V., Akzo Nobel Polymer Chemicals, LLC, and Indopco, Inc.

[6] By order entered November 9, 2009, the Court (Ross, J.) granted a motion to continue the November/December 2009 trial date to avoid "the probability that the assigned trial judge may have to abandon the trial mid-stream," given that his designation as a senior sitting judge was nearing its end. (Order 2, entered Nov. 9, 2009.)

filed and approved to dismiss the claims against UOP, Shell, and American Cyanamid. Not Litwin. But Litwin had represented in writing and in open court that Plaintiffs had agreed to settle.[7] Plaintiffs were not able to settle with the Hess Defendants. Consequently, the Court selected four cases for trial in July 2010.[8] Since Plaintiff did not assert claims against the third-party defendants, trial proceeded against Hess and HOVIC only on July 13, 2010.Before the cases were submitted to the jury, however, the attorneys informed the Court that all eighty-seven Plaintiffs had agreed to settle. After granting counsel time to formalize settlement papers, the Court (Willocks, J.) granted Plaintiffs' requests to dismiss their claims against the Hess Defendants with prejudice. The Order expressly provided, however, that "the cross-claims and third-party claims of HOVIC and Hess shall remain open and pending and shall not be dismissed." (Order 1, dated Nov. 20, 2010, entered May 14, 2015.)

¶8 Several months later, after the first-party cases were resolved, *but cf. supra* note 7, the Hess Plaintiffs, on February 11, 2011, filed the first motion addressed in this Opinion: for summary judgment against IMC. Hess and HOVIC also asked for leave to exceed the page limits imposed by Rule 56.1(e) of the Local Rules of Civil Procedure promulgated by the District Court of the Virgin Islands, applied through Superior Court Rule 7. Roughly two weeks later, the Hess Plaintiffs and IMC stipulated to give IMC until May 2, 2011 to respond to summary judgment. However, the Court (Willocks, J.) denied the motion to exceed page limits and directed Hess and HOVIC to refile their motion. As a result, the Hess Plaintiffs filed an "amended" motion for summary judgment on March 24, 2011.[9] Three days shy of the May 2, 2011 stipulated deadline to respond to the initial summary judgment motion, IMC filed a motion for leave to conduct discovery. The Hess Plaintiffs opposed.

¶9 Four years later, "the Administrative Judge of the Superior Court scheduled and then held a global status conference to discuss with counsel options for more efficiently managing the complex and toxic tort cases pending in the St. Croix District." *In re: Asbestos, Catalyst, & Silica Toxic Dust Exposure Litig.*, 67 V.I. 544, 547 (Super. Ct. 2017). "[T]he phrase 'complex litigation cases'" was meant "to encompass 'any lawsuit that alleges toxic tort claims arising from, related to, or concerning the former oil refinery or aluminum refinery on St. Croix and that also involves

---

[7] Technically, because no documentation concerning the claims Plaintiff asserted against Litwin has been filed, the eighty-seven cases remain open.

[8] See *In re: Catalyst Litigation*, 55 V.I. 3, 3 (Super. Ct. 2010), for the four cases selected for trial.

[9] Technically, Hess and HOVIC did not withdraw and refile their February 11, 2011 motion.

... multiple defendants and/or third-party actions.'" *In re: Alumina Dust Claims*, 67 V.I. at 185 n.9 (citation omitted). The *Catalyst* cases were among the cases discussed at the status conferences. During the May 14, 2015 status conference, the Court referred the third-party litigation to mediation and granted the parties leave to supplement pending motions in light of changes in the law recognized by *Government of the Virgin Islands v. Connor*, 60 V.I. 597 (2014) (*per curiam*). *Cf. In re: Connor*, 61 V.I. 273, 278 n.2 (2014) (*per curiam*) ("[P]arties . . . may desire to be heard on the *Banks* issue before the Superior Court issues a decision, which may require supplemental briefing or even oral argument.").

¶10 The next day, May 15, 2015, the Court, by order, alerted the Hess Plaintiffs to several concerns with their third-party action: some third-party defendants had been served but had not appeared, other third-party defendants had not appeared, but proof of service was not filed. Considering the amount of "absent" third-party defendants, the Court withheld ruling on the second motion addressed in this Opinion: a motion filed on June 21, 2011, for leave to amend the third-party complaint. The Court found it best to defer adding more third-party defendants until the status of the absent third-party defendants was resolved.

¶11 Several months later, despite having granted the parties' requests to refer the third-party litigation to mediation and allow supplemental briefing in light of *Connor*, the Hess Plaintiffs, IMC, and others jointly moved the Court on June 8, 2015, to defer the briefing deadline until thirty days after the mediation. If mediation was successful, they argued, incurring the cost and expense associated with a *Banks* analysis was unnecessary. The Court granted the joint motion and reduced its oral ruling to writing, issuing a formal mediation referral order, setting September 16, 2015, as the deadline to complete mediation.

¶12 But then, on August 6, 2015, IMC (and others) moved to continue mediation to a date certain. The reason why was not clear until two weeks later when, on August 25, 2015, the mediator submitted his initial report, explaining that several parties (but not all) met for an initial mediation conference then adjourned to allow the Court time to resolve several motions. But the motions the mediator identified were the same motions the parties wanted leave to supplement. As it stood, mediation could not go forward because the parties wanted certain motions resolved. But, before those motions could be resolved, supplemental briefs had to be filed. Yet, the briefing deadline was deferred for mediation to go forward. To resolve the catch22, the Court granted IMC's motion and stayed formal mediation until December 31, 2015, extended mediation to February 19, 2016, and reinstated an abbreviated briefing deadline. IMC and the

Hess Plaintiffs filed supplemental briefs on December 2, 2015 and December 3, 2015, respectively.

¶13    The Court (Willocks, J.) held a status conference on December 10, 2015. After noting the quantity of motions filed after the global status conferences,[10] and counsel's inability to resolve even minor issues on their own, the Court ordered that "except for an emergency matter that requires immediate action or a stipulation for dismissal, a stay is imposed on the filing of any further motions, stipulations, or other request for relief (whether made individually or jointly) until September 1, 2016, unless sooner lifted by court order." (Order 1, entered Dec. 18, 2015.) The mediator subsequently notified the Court that only some parties engaged in a session held on January 22, 2016, that ultimately ended in an impasse. The parties were still "at a standstill due to the confidentiality agreement regarding the original Plaintiffs' settlements," and several pending motions that "address[] the confidentiality matter [but] in a different manner." (Med. Report and Req. for Ct. Assist. 2, filed Jan 27, 2016.)

## II.  DISCUSSION

¶14    It is against this broad background that the Court[11] turns to the Hess Plaintiffs' amended summary judgment motion,[12] and IMC's motion to take discovery, as well as the Hess Plaintiffs' motion for leave to amend their amended third-party complaint. Because motions for leave to take discovery must be resolved first, the Court must address IMC's motion before addressing the Hess Plaintiffs' motions. *Cf. Rivera-Mercado v. Gen. Motors Corp.*, 51 V.I. 307, 332 (2009) (Swan, J., concurring) ("'[W]hatever its decision, it is improper for a trial court to rule on summary judgment without first ruling on a pending 56(f) motion.'" (brackets and citation omitted)).

### A.    Motion for Leave to Take Discovery

#### (1)    *Arguments*

¶15    In its April 29, 2011 motion, IMC argues that Hess and HOVIC "refused to provide

---

[10] The docket for the master case reveals that approximately twenty-nine motions—some ministerial, e.g., to substitute counsel or appear by telephone, others substantive and dispositive, e.g., to dismiss for insufficient service of process or to vacate entry of default—were filed between the months of June and December 2015.

[11] By order dated August 14, 2018, entered August 20, 2018, the Presiding Judge of the Superior Court designated the *Catalyst* cases as complex, transferred them to the Complex Litigation Division, and reassigned them to the undersigned judicial officer.

[12] The Court will refer to the amended summary judgment motion to avoid confusion with the initial motion rejected because it exceeded the page limits. Technically, the Hess Plaintiffs did not amend their summary judgment motion. But it was effectively withdrawn and refiled.

essential discovery about [their] third party claim[s]." (Third-Party Def. IMC's Mot. to Take Disc. Pursuant to R. 56(d) in Resp. to S.J. Mot. 2, filed Apr. 29, 2011 (hereinafter "Discovery Mot.").[13]) For this reason, IMC requests leave to engage in discovery because it cannot adequately respond. IMC concedes that "respiratory protection at the refinery in the early years was reportedly poor, [but] by all accounts such protection improved dramatically by the mid to late 1980s when IMC began working [there] . . . ." *Id.* at 4. As a result, "any harmful exposure to catalyst would have been substantially reduced," IMC contends, "by the time any of the[se eighty-seven] Plaintiffs may have worked for IMC." *Id.* Since IMC was not brought into this litigation until after Plaintiff were deposed, IMC did not have an opportunity to develop the facts, it argues. And, while IMC served Hess and HOVIC "with interrogatories and requests for production of documents," they "refused to provide substantive responses to any of this discovery." *Id.* at 2. So, IMC asks for discovery in the following areas: (1) the amount the Hess Defendants paid to settle with Plaintiff; (2) whether settlement amounts were determined on a case-by-case basis or for the group as a whole; (3) whether the Hess Defendants considered the potential risk of punitive damages in deciding how much to settle for; (4) whether the Hess Defendants paid more than they should have; and (5) the actual costs incurred to settle. *See id.* at 13-17. In a supporting affidavit, IMC's attorney at the time the motion was filed detailed what he believed discovery would reveal:

> [f]acts related to the tendering of the defense and/or tendering of the settlement (or failure to tender) to IMC. . . . Why HOVIC and Hess paid settlements to plaintiffs who did not present with lost work, lost wages, medical bills, or proven injuries caused by identifiable incidents of negligence, and whether to do so had a basis in fact or was reasonable. On what basis HOVIC and Hess tendered all 84 cases but now seeks indemnification in 49 cases, and what basis in fact exists for indemnification in any of the cases. Whether IMC is in fact an indemnitor and what the specific terms and conditions are in any and all potentially applicable indemnity agreements over the decades covered by the claims period. . . . Whether HOVIC and Hess were "volunteers" in the eyes of the law and therefore not entitled to indemnification.

---

[13] When IMC filed its motion to take discovery in 2011, Federal Rule of Civil Procedure 56(f)—renumbered in 2010 as 56(d) "without substantial change," (IMC's Discovery Mot. 9)—governed in the Superior Court through Superior Court Rule 7. Since then, the Supreme Court of the Virgin Islands promulgated the Virgin Islands Rules of Civil Procedure, which includes a similar rule, Rule 56(d). *See generally In re: Adoption of the V.I. Rules of Civ. P.*, S. Ct. Prom. No. 2017-001, 2017 V.I. Supreme LEXIS 22 (V.I. Apr. 3, 2017). Rule 1-1 provides that the Virgin Islands Rules of Civil Procedure apply to all actions pending when the rules took effect, March 31, 2017, unless the Supreme Court directs otherwise or the judge on a case-by-case basis determines that it would unjust or unfeasible to apply the new rules. *See* V.I. R. Civ. P 1-1(c)(2). The Virgin Islands Rules could not apply since the motion was filed six years before they were promulgated. However, the federal rule and the Virgin Islands rule are identical. For the sake of simplicity, the Court refers to the Virgin Islands rule even though the motion papers cite and discuss the federal rule.

*Id.* at Ex. 1 (Bruce D. Spector, Esq. Affid. ¶ 7, Apr. 29, 2011) (formatting altered).

¶16    Hess and HOVIC raise procedural and substantive objections in opposition. First, they dispute IMC's compliance with Rule 56(d), specifically because its memorandum of law was not signed under oath and, therefore, cannot satisfy the affidavit requirement. Second, the affidavit IMC did submit was insufficient, they argue, because it "fatally" failed to explain how the information IMC seeks would defeat summary judgment. (Hess Pls' Opp'n to IMC's Mot. to Take Disc. Pursuant to R. 56(d) 4, filed May 13, 2011.) Third, IMC "ignored its 'obligations at its own peril,'" they argue. *Id.* at 8 (quoting *Dominic v. Hess Oil V.I. Corp.*, 624 F. Supp. 117, 120 (D.V.I. 1985). Counsel for IMC "monitored trial daily and was present in [c]ourt . . . when settlement was announced," the Hess Plaintiffs explain, yet "made no objection or request to intervene." *Id.* If Hess and HOVIC had gone to trial with all Plaintiffs, additional expense would have been incurred, they point out. Fourth, the "case law of this jurisdiction," specifically *Dominic*, empowers the courts to determine "as a matter of law" whether settlement is reasonable. *Id.* at 5. Thus, the Court should find that Hess and HOVIC were reasonable in settling with Plaintiffs and grant judgment summarily on liability, but defer ruling on damages.

¶17    In the alternative, Hess and HOVIC object to each area IMC identified for discovery. First, they assert that the Court should review settlement documents *in camera*. Since information IMC seeks can be disclosed differently, IMC's motion fails, they contend. Second, concerns about the amounts paid to each Plaintiff must also be rejected because they "have no intention of seeking from IMC the total settlement," only "the portion . . . paid . . . to the 49 plaintiffs at issue." *Id.* at 13. And it was Plaintiffs' counsel who revisited settlement during trial, "not the other way around," they note. *Id.* at 14. Finally, Hess and HOVIC argue that IMC's motion should be denied because what IMC seeks is confidential or privileged work-product.

¶18    In reply, IMC rejects Hess and HOVIC's suggestion that "IMC's entire legal analysis" had to be set forth in an affidavit, because that interpretation would "result in the affidavit . . . subsuming the entire memorandum of law." (IMC's Reply to Hess Pls' Opp'n to R. 56(d) Mot. 3, filed May 31, 2011.) IMC also vehemently rejects the Hess Plaintiffs' "attempt[] to deceive this Court into thinking that it may rule, as a matter of law, that the settlement is reasonable," *id.* at 4, countering that IMC had to be provided "with facts of settlement, and . . . an opportunity to contest the reasonableness of settlement." *Id.* IMC claims the Hess Plaintiffs are trying "to 'railroad' IMC through a premature motion for summary judgment," noting that Hess and HOVIC had six years "to prepare [their] defense to the underlying claim[s] and participated in more than

100 depositions . . . *before* joining IMC as a third party." *Id.* at 1. Finally, partial summary judgment should not be granted, IMC counters, because moving for leave to take discovery "*stays* the determination of *all* aspects of the summary judgment motion." *Id.* at 8.

### (2) *Legal Standard and Analysis*

¶19   A motion to take discovery filed in response to a motion for summary judgment functions like a continuance if granted. *See Rivera-Mercado*, 51 V.I. at 311. To obtain the continuance, the moving party "must explain what particular information is sought; how, if learned, it would preclude summary judgment; and why it has not previously been obtained." *Id.* at 313 (quotation marks and citation omitted); *accord* V.I. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may defer considering the motion or deny it; allow time to obtain affidavits or declarations or to take discovery; or issue any other appropriate order." (internal numbers and breaks omitted). Courts should "typically" grant a motion to take discovery "as a matter of course," 51 V.I. at 311 (quotation marks and citation omitted), so long as the motion is supported by an affidavit. *Id.* at 312.

¶20   Before turning to the merits, the Court rejects Hess and HOVIC's challenge to the sufficiency of the affidavit. "The purpose of the affidavit is to ensure that the nonmoving party is invoking the protections of Rule 56([d]) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition." *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988) As *First Chicago International* explained:

> several courts have held that filing an affidavit is necessary for the preservation of a Rule 56([d]) contention, [but] other circuits have excused the absence of a Rule 56([d]) filing on the ground that other documents filed by the plaintiff—such as opposing motions and outstanding discovery requests—sufficed to alert the [trial] court of the need for further discovery and thus served as the functional equivalent of an affidavit.

*Id.* (footnote omitted). Furthermore, even though

> "meticulous, technical compliance with . . . [the] requirement that a request for delay be supported by affidavits" is strongly encouraged, the "failure to support a . . . motion by affidavit is not automatically fatal to is consideration" so long as the party "informs the [trial c]ourt why delay is needed before the motion for summary judgment can be properly considered."

*Rivera-Mercado*, 51 V.I. at 311 (alterations omitted) (quoting *St. Surin v. V.I. Daily News*, 30 V.I. 373, 379 (3d Cir. 1994)). An affidavit is clearly required. But the affidavit cannot, as IMC argues, subsume the motion. What IMC submitted was more than enough to satisfy the requirements of

the rule. So, the Court rejects the Hess Plaintiffs' objections.

¶21    Turning to the merits, to obtain a continuance IMC must show "'what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.'" *Id.* at 313 (citation omitted). Taking the factors out of order, the Court finds that IMC satisfied the last factor: why it lacks sufficient information to respond. Hess and HOVIC refused to respond to discovery demands. On this point, the parties agree. Hess and HOVIC do not dispute that they refused to provide the information IMC requested. They cannot provide it, they contend, because the settlement agreements are confidential and not discoverable. Regarding the other information IMC seeks, Hess and HOVIC claim they do not have it. Plaintiffs produced it during discovery. (*See* Hess Pls.' Opp'n to IMC's Discovery Mot. 4 n.3 ("[S]ome of the information sought by IMC in relation to settlement is in possession of plaintiffs and not Hess.")); *id.* at 9 (IMC "has been provided access to a website that contains thousands of pages of discovery produced in this matter and Hess has agreed to produce all relevant, non-privileged documents at [its] counsel's office.").)

¶22    Hess and HOVIC are partly correct: IMC is not restricted to obtaining discovery only from them. Nonparties and co-defendants can be served with interrogatories, deposed, and asked to produce documents. Many areas IMC identified do concern Plaintiffs. But the Hess Plaintiffs (and all third-parties) overlook one very important point: the October 16, 2009 Order severed the third-party action. "Once severed, the claims proceed separately as 'independent actions with separate judgments entered in each.'" *Abednego v. St. Croix Alumina, LLC*, 63 V.I. 153, 183 (Super. Ct. 2015) (quoting *DirecTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006)). Severance was ordered, but no one followed the Order, including the Court. One consequence is that a case management order never issued to govern discovery in the third-party action. Instead, the third-party litigation was stayed, not severed.

¶23    Superior Court Rule 38, which governed at the time, provided that pre-trial procedure, including scheduling orders and discovery conferences, was not automatic in the Superior Court. *See* Super. Ct. R. 38 ("Pre-trial procedure, as provided by Rule 16 of the Federal Rules of Civil Procedure, shall not be mandatory in the superior court, but may be employed in the discretion of the presiding judge, the trial judge or on motion of any party.");[14] *cf. Robles v. Beautiful Hair*

---

[14] The Court is unaware of any standing order issued by a presiding judge pursuant to Rule 38 employing pre-trial procedure in certain types of actions or all civil actions.

*Designs*, SX-09-CV-503, 2011 V.I. LEXIS 80, *7-8 n.6 (Super. Ct. Aug. 24, 2011) ("The pretrial conference . . . is not automatically applicable in the Superior Court. Instead, [its] . . . applicability is contingent upon . . . discretion . . . . [because m]andating a pretrial conference for every civil matter filed in the Superior Court would consume precious and limited judicial resources." (quotation marks and citations omitted)). Here, a case management order issued to employ discovery in the first-party litigation, but not the third-party litigation. And the third-parties did not move for a discovery conference or submit a stipulated scheduling order. So, IMC is correct: the Hess Plaintiffs' motion is premature.

¶24     The Court also finds that IMC satisfied the second factor: what discovery is needed. IMC claims it cannot respond to summary judgment because it needs to know how much the Hess Plaintiffs settled for, whether amounts were individualized per Plaintiff (and if so on what basis), and whether the Hess Defendants paid more than they should have. IMC identifies another area of concern, information "related to the tendering of the defense and/or tendering of the settlement (or failure to tender) to IMC." (*See* IMC's Discovery Mot, Spector Affid. ¶ 7(m).) Whether IMC is entitled to this information is the subject of other motions. But pending motions do not delay discovery. *Cf. Rivera-Mercado*, 51 V.I. at 314 n.7 ("[A]dditional discovery should not be rejected solely on a court's view of the likely outcome of that discovery."); *accord* V.I. R. Civ. P. 26(d)(4) ("The filing of any motion—including potentially dispositive motions such as a motion to dismiss or a motion for summary judgment—shall not stay discovery in the action unless the judge so orders.").

¶25     The Hess Plaintiffs disagree, arguing that "many of the listed 'facts' are legal conclusions." (Hess Pls.' Opp'n. 4 n.4.) For example, one area IMC identifies is "[w]hether HOVIC or Hess were grossly, willfully, intentionally or recklessly negligent." (IMC's Discovery Mot, Spector Affid. ¶ 7(n).) And Hess and HOVIC are correct: whether and to what extent a party is negligent is determined by the fact-finder. But discovery uncovers facts that will or will not show whether, and to what extent, someone was negligent. Admittedly, IMC's proffer does read like a legal conclusion. But what IMC seeks is information about what caused Plaintiffs' claims and what actions Hess and HOVIC took (or failed to take) that will show whether they were negligent (grossly, solely, or otherwise). Clearly, knowing this information will aid IMC in deciding whether Plaintiffs' claims fell within or outside the scope of the agreements to indemnify Hess and HOVIC. (*See* IMC's Reply to Hess Pls' Opp'n to Discovery Mot. 11 ("Some of these Plaintiffs worked with catalyst for 20 years before IMC was formed and signed their first contract with

HOVIC in 1986. . . . IMC did not reasonably expect that they would be assuming any pre-existing exposure when it signed contracts with HOVIC in 1986 and 1994.").

¶26    Although IMC satisfied the "what" and the "why" factors, it has not satisfied the "how" factor. On this point, the Hess Plaintiffs are correct. IMC, in its submissions, "nowhere explains how the information [it] seeks will preclude [s]ummary [j]udgment if uncovered." (Hess Pls' Opp'n to IMC's Discovery Mot. 4.) That is, IMC has not explained, at least not in detail, how learning what amount Hess and HOVIC settled each case for, whether they settled out of fear of punitive damages, or whether they paid more than they should have – how discovering this information would defeat summary judgment. *Cf. Rivera-Mercado*, 51 V.I. at 313-14. Nonetheless, in this instance, the Court is not troubled by IMC's failure to satisfy all three factors because, as discussed further below, Hess and HOVIC's motion reveals deficiencies that preclude granting summary judgment.

¶27    Accordingly, having considered the parties' arguments, and mindful of the posture of this case, the Court concludes that IMC's motion must be granted. "Delay of summary judgment for additional discovery is not available to litigants who act lackadaisically but requires due diligence both in pursuing discovery before the summary judgment initiative surfaces and in pursuing an extension of time thereafter." *Rohn v. Daily News Publ. Co.*, SX-04-CV-158, 2015 V.I. LEXIS 158, *22 (V.I. Super. Ct. Oct. 21, 2015) (quotation marks, citation, ellipses, and emphasis omitted)). Here, IMC has shown diligence, before and after the Hess Plaintiffs moved for summary judgment. IMC has also shown the information it needs and why it has been unable to obtain it. While IMC did not explain how that information will preclude judgment, the Court agrees that the "what, how, and why" factors are not "exhaustive" but "simply a guide for the court to follow in exercising its discretion." (Hess Pls' Opp'n to IMC's Discovery Mot. 3 n.2 (citing *Rivera-Mercado*, 51 V.I. at 313).) No order issued to govern discovery. Under the circumstances, the Court finds that IMC's motion should be granted, and a case management order issued to govern discovery.

### B.    The "Amended" Motion for Summary Judgment[15]

#### (1)    *Arguments*

---

[15] Ordinarily, granting leave to take discovery defers ruling on summary judgment. In this instance, however, the Court will exercise its discretion to address the Hess Plaintiffs' motion, notwithstanding granting IMC's motion, because the motion highlights concerns with the posture of this litigation. Additionally, deferring ruling on summary judgment would be futile if the motion is deficient regardless of the evidence IMC might marshal in opposition. IMC's right to respond will be preserved should the Hess Plaintiffs renew their motion.

¶28 Hess and HOVIC seek summary judgment against IMC, claiming "IMC breached its contracts to defend HOVIC and Hess" and thus they "are entitled to indemnification from IMC . . . [for] the legal expenses, attorney's fees, and settlement amounts" paid to settle with forty-nine Plaintiffs. (Hess Pls.' Amend. S.J. Mot. 18, filed Mar. 24, 2011.) In support, they submit copies of the following: (1) their Amended Third-Party Complaint and IMC's Answer and Counterclaim; (2) a 1986 purchase order HOVIC issued to IMC; (3) a 1994 maintenance service agreement between HOVIC and IMC; (4) correspondence between HOVIC and IMC employees; (5) excerpts of depositions of forty-five Plaintiffs; and (6) social security records and other discovery for several Plaintiffs. (*See generally* Hess Pls' Amend. S.J. Mot., Exhs. A-A3.) According to Hess and HOVIC, IMC's duty to indemnify stems from

> two substantially similar indemnification agreements . . . collectively covering the period of 1986 to 1998. Both agreements provide three terms as conditions for indemnification: (1) indemnities must be HOVIC *or its affiliates,* successors and assigns; (2) the occurrences giving rise to the claim must be in connection to IMC's services, and (3) the indemnities collectively cannot be solely negligent for the claimed injuries.

(Hess Pls.' Amend. S.J. Mot. 5 (emphasis added). The tort claims of forty-three Plaintiffs fall under the 1986 purchase order, while another six Plaintiffs' claims fall under the 1994 maintenance service agreement. Forty-three Plaintiffs claimed exposure to catalyst dust while working for IMC, and another six claimed exposure to catalyst dust as bystanders when IMC "was responsible for the loading and unloading of catalyst between 1986 and 1998." *Id.* at 8. Both agreements provide for indemnification of HOVIC unless it is "determined that any liability was caused by the **sole negligence** or **sole willful misconduct** of HOVIC." *Id.*, Ex. D (letter from Frank Keleman to Robert S. Lewis, dated July 28, 1986 (emphasis added) (hereinafter "July 28, 1986 letter"); *id.* at Ex. H (HOVIC-IMC Agmt ¶ 11.1, dated Apr. 4, 1994 (emphasis added)) (hereinafter "1994 Maint. Servs. Agmt.").

¶29 Regarding the 43 Plaintiffs, Hess and HOVIC argue that a jury could not have found them solely negligent "because IMC [also] owed a non-delegable duty [to their own employees] . . . ." *Id.* at 9. Regarding the 6 "bystander" Plaintiffs, Hess and HOVIC contend that a jury also could not have found them solely negligent "because IMC [also] owed an affirmative duty to ensure that . . . bystanders . . . were not exposed to catalyst dust while . . . conducting catalyst work." *Id.* Hess and HOVIC also point out that Plaintiffs had sued Shell, UOP, and American Cyanamid as well, and claimed they were strictly liability owing "a duty to warn end-users (such as plaintiffs) of their products." *Id.* at 10-11. Thus, "the Court should rule that HOVIC and Hess cannot be solely

negligent for plaintiffs' alleged injuries, as a matter of law, and . . . hold as a matter of law that plaintiffs' claims fall within the ambit of the contractual indemnification" agreements. *Id.* at 12. This comprises their first argument for summary judgment.

¶30    The remaining arguments concern whether Hess and HOVIC were reasonable in settling with the 49 Plaintiffs. "Hess and HOVIC only need[ed] to establish their [own] potential liability, and not their actual liability," they contend, in order "to satisfy the first element of the reasonable settlement analysis." *Id.* at 13. Citing *Bainville v. Standby Power Supplies, Inc.*, 837 F.2d 128 (3d Cir. 1988), they assert that the United States Court of Appeals for the Third Circuit previously found that the "broad language" in HOVIC's indemnification agreements showed "intent . . . to condition indemnification on HOVIC and Hess' potential liability, not actual liability." *Id.* Since the 1986 purchase order with IMC has "the same language" as the one at issue in *Bainville*, "th[is] Court should [also] rule that HOVIC and Hess only need to show potential liability to be entitled to indemnification from IMC." *Id.* In *Bainville*, Hess and HOVIC "clearly faced potential liability from the underlying plaintiffs," so here too "the Court should find as a matter of law that HOVIC and Hess acted reasonably in avoiding its [sic] potential liability exposure by settling with all plaintiffs during the trial" of four cases. *Id.* at 15-16.

### (2)    *Legal Standard and Analysis*

¶31    "'Summary judgment is a drastic remedy, and should be granted only when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact.'" *Machado v. Yacht Haven USVI, LLC*, 61 V.I. 373, 379-80 (2014) (brackets and citation omitted). The party seeking summary judgment has the burden to put forth evidence and show how that evidence shows that material facts are no longer in dispute and judgment should be entered summarily. *See United Corp. v. Hamed*, 64 V.I. 297, 309 (2016) ("'The party moving for summary judgment possesses the initial burden of identifying evidence indicating that there is an absence of any issue of material fact.'" (brackets omitted) (quoting *Martin v. Martin*, 54 V.I. 379, 391 (2010) (*per curiam*)). This burden is the same whether the movant is the plaintiff or the defendant, whether the motion seeks judgment on a claim, crossclaim, counterclaim, third-party claim, or affirmative defense. *See, e.g., Sealey-Christian v. Sunny Isle Shopping Ctr., Inc.*, 52 V.I. 410, 420 (2009) ("'One of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.'" (brackets omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)); *see also Clark v. Modern Grp.*, 9 F.3d 321, 326 (3d Cir. 1993) ("A defendant meets this standard when there is

an absence of evidence that rationally supports the plaintiffs' case. A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law." (citation omitted)).

¶32    To determine whether summary judgment is warranted, courts "conduct[] an independent review of the entire record" to see if any issues of material fact remain in dispute. *Vanterpool v. Gov't of the V.I.*, 63 V.I. 563, 594 (2015). "An issue of material fact is genuine and consequently summary judgment is improper, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Palisoc v. Poblete*, 60 V.I. 607, 618 n.10 (2014) (quoting *Sealey-Christian*, 52 V.I. at 421)). Facts are considered material if they "affect the outcome of the suit under the governing law." *Williams v. United Corp.*, 50 V.I. 191, 195 (2008). However, when the substantive law is unsettled, the court must decide what law governs "because summary judgment is determined according to 'the substantive law governing the cause of action.'" *Der Weer*, 64 V.I. at 135 (quoting *Perez v. Ritz-Carlton (V.I.), Inc.*, 59 V.I. 522, 528 (2013)).

¶33    Here, when Hess and HOVIC moved for summary judgment, the law governing indemnity agreements was settled. But since then, the Supreme Court of the Virgin Islands rejected mechanistic reliance on prior precedent "based on a belief that application of the Restatements or the majority rule was mandatory pursuant to 1 V.I.C. § 4 as in effect prior to this Court's ruling in *Banks*." *Connor*, 60 V.I. at 603 n.1. Now "the Superior Court, when considering a question not foreclosed by prior precedent from this Court, must perform a three-part analysis as set forth in *Banks*." *Id.* at 603. Because the Virgin Islands Supreme Court has not yet addressed the law governing indemnification agreements, the Court (Willocks, J.) gave the parties leave to file supplemental briefs, specifically "to brief certain questions of law at issue in their motion papers that may no longer be governed by binding precedent in light of *Government of the Virgin Islands v. Connor*, 60 V.I. 597 (2013)." (Order 1, entered May 14, 2015.) Leave was not limited to any particular motion, however.

¶34    The Hess Plaintiffs and IMC took the opportunity to supplement their respective positions. But neither side addressed whether indemnification agreements should be recognized under Virgin Islands common law. Instead, both sides assumed that they would be. The consequence now is that the Court has before it a motion for summary judgment. But summary judgment presupposes that the law governing the claims and defenses has been settled. Otherwise, the parties could not develop the factual record. And a *Banks* analysis also entails, not

only deciding what common law rule to adopt, but whether to recognize a specific rule at all. *Cf.*
*Matthew v. Herman*, 56 V.I. 674, 684 (2012) (declining to recognize amatory torts under Virgin
Islands common law); *Machado*, 61 V.I. at 380, 385-86 (adopting elements of negligence claim
and rejecting common law distinction between invitees, licensees, and trespassers); *accord*
*Carlos Warehouse v. Thomas*, 64 V.I. 173, 184 (Super. Ct. App. Div. 2016) ("The purpose of a *Banks*
analysis—where common law claims and defenses not yet recognized in binding precedent is
concerned—is *first to determine whether* the claim or defense should be recognized under Virgin
Islands common law, and then how it should be recognized, meaning what specific rules should
be adopted." (emphasis added)); *see also McKenzie v. Hess Oil V.I. Corp.*, 70 V.I. 210, 221 n.5
(Super. Ct. 2019) ("Here, a *Banks* analysis would entail deciding first, whether to recognize loss
of consortium claims . . . .").

¶35     Before determining whether a *Banks* analysis is necessary, the Court must decide first
what claims are at issue.[16] *Accord Walters*, 60 V.I at 775 ("Before we consider the Superior
Court's summary judgment decision, we must determine what causes of action Aubrey actually
asserted."). This is not an action for specific performance of an indemnification agreement. *Cf.*
*C.H. Heist Caribe Corp. v. Am. Home Assurance Co.*, Civ. No. 79-151, 1980 U.S. Dist. LEXIS 17890,
*1 (D.V.I. June 27, 1980) ("This is an action for declaratory judgment *by an insured* against its
insurance carrier . . . seek[ing] a judicial declaration that a third party claim in another action
based on contractual indemnity is within the coverage of a policy of insurance purchased."), *aff'd*
*in part*, 640 F.2d 479 (3d Cir. 1981); *see also Dominic*, 624 F. Supp. at 120 ("[O]nly three options
are available to a liability insurer requested to defend an insured against claims which the
insurer believes exceed policy coverage . . . (1) seek a declaratory judgment regarding its
obligations before or pending trial of the under-lying action, (2) defend the insured under a
reservation of rights, or (3) refuse either to defend or seek a declaratory judgment at the

---

[16] Although deciding what law governs is ultimately a legal question for a court to resolve, when the question
concerns whether the Virgin Islands should recognize a particular cause of action or defense, the parties generally
should have a chance to weigh in. *Cf. In re: Connor*, 61 V.I. at 278 n.2; *see also Antilles School v. Lembach*, 64 V.I. 400,
428 n.13 (2016) ("[A]bsolutely no basis" in Virgin Islands Supreme Court precedent "for the proposition that
attorneys are not required to fully brief all questions of law relevant to the issues that are being litigated, including
all three *Banks* factors."). The Court granted leave to file supplemental briefs in light of *Connor*. The Hess Plaintiffs
and IMC filed briefs, but only the Hess Plaintiffs addressed what law governs contractual indemnification. IMC
limited its briefing to whether confidential settlement agreements should be discoverable by other parties in the
same litigation. Neither side questioned whether the Virgin Islands should recognize contractual indemnification
claims. Since all parties were given a chance to be heard regarding the soundest rule for the Virgin Islands, the Court
proceeds to address the legal question. At some point briefing must end and a decision made.

insurer's peril that it might later be found to have breached its duty to defend." (citation omitted)), *rev'd on other grounds*, 841 F.2d 513 (3d Cir. 1988)). That is, Hess and HOVIC did not commence a declaratory judgment action. Instead, the Hess Defendants brought IMC (and all other Third-Party Defendants) into these cases by third-party complaint. Accordingly, since a written agreement whereby one party agrees to indemnify another party is essentially a contract, contract law governs. *See, e.g., Gartside v. Young Men's Christian Ass'n*, 274 N.W.2d 58, 60 (Mich. Ct. App. 1978) ("Indemnity contracts, like other contracts, are to be enforced so as to effectuate the intentions of the parties"); *Moberly v. Leonard*, 99 S.W.2d 58, 63 (Mo. 1936) ("There are two kinds of indemnity contracts: indemnity against liability, and indemnity against loss.");.. And Virgin Islands common law already recognizes breach of contract as a cause of action. To establish a claim for breach of contract, the claimant must "demonstrate: (1) an agreement; (2) a duty created by that agreement; (3) a breach of that duty; and (4) damages." *Phillip v. Marsh-Monsanto*, 66 V.I. 612, 621 (2017) (citing *Brouillard v. DLJ Mortg. Capital, Inc.*, 63 V.I. 788, 798 (2015)). Thus, a *Banks* analysis is unnecessary to decide whether Virgin Islands common law should recognize breach of contract as a cause of action. It already does.

¶36    But a *Banks* analysis is required to address whether the Virgin Islands should recognize a claim for breach of an indemnification agreement; not all contracts are enforceable. *See, e.g., Slack v. Slack*, 62 V.I. 366 (Super Ct. 2015) (conducting a *Banks* analysis regarding the validity of prenuptial agreements), *aff'd in part, rev'd in part, and remanded on other grounds*, 69 V.I. 567 (2018). *Compare CSX Transp. v. Kirby*, 687 N.E.2d 611, 615 (Ind. Ct. App. 1997) ("[O]ur supreme court has said that a 'party may not contract against his own negligence.'" (quoting *Freigy v. Gargaro Co.*, 60 N.E.2d 288, 292 (Ind. 1945)); *with Indem. Ins. Co. v. Koontz-Wagner Elec. Co.*, 233 F.2d 380, 383 (7th Cir. 1956) ("'Neither law nor public policy prevents the ordinary contractor from buying from a third party indemnity from the pecuniary result of his own negligence. That is legitimate as insurance.'" (citation omitted)), and *O'Callaghan v. Waller & Beckwith Realty Co.*, 146 N.E.2d 198, 202 (Ill. Ct. App. 1957) ("[I]n the field of indemnity contract law . . . the trend has been toward extending the principle of freedom of contract, as against the argument that an agreement indemnifying one against the consequences of his own negligence is void as against public policy."). Consequently, this Court must exercise its "concurrent authority with th[e Supreme] Court to shape Virgin Islands common law." *Connor*, 60 V.I. at 604.

¶37    The first step, whether Virgin Islands courts previously adopted a specific rule, asks whether local courts have rendered "reasoned decisions" the Virgin Islands has grown to rely

on. *See id.* at 603. The second step, determining the positions taken by other jurisdictions, requires considering all sides to examine the different approaches, if any, other states and territories have taken. *See id.* The third step, deciding what rule is soundest for the Virgin Islands, "mandates that the Superior Court weigh all persuasive authority both within and outside the Virgin Islands, and determine the appropriate common law rule based on the unique characteristics and needs of the Virgin Islands." *Id.* (citations omitted). Each is considered below.

¶38    Regarding the first factor, Virgin Islands courts have recognized a cause of action for breach of contractual indemnification for several decades now. *See, e.g., Frederick v. Hess Oil V.I. Corp.*, 17 V.I. 523, 527-33 (D.V.I. 1980), *aff'd* 642 F.2d 53 (3d Cir. 1981); *Beloit Power Sys. v. Hess Oil V.I. Corp.*, 19 V.I. 519 (D.V.I. 1983), *rev'd in part*, 757 F.2d 1427 (3d Cir. 1985), and *aff'd in part*, 757 F.2d 1431 (3d Cir. 1985); *Dominic*, 624 F. Supp. 117; *Bainville*, 837 F.2d 128; *Eastern Airlines, Inc. v. Ins. Co. of N. Am.*, 758 F.2d 132 (3d Cir. 1985); *Hess Oil V.I. Corp. v. Firemen's Fund Ins. Co.*, 22 V.I. 139, 146 (D.V.I. 1986) (directing entry of judgment "on the issue of liability for breach of the . . . contract[] for indemnification."); *Innovative Comm. Corp. v. V.I. Water & Power Auth.*, 49 V.I. 57, 59 (Super. Ct. 2007) ("Plaintiff herein sues Defendant for Breach of Contract for failing to indemnify it in *Wynter* [*v. Innovative*]."). "A cause of action for contractual indemnification is similar to its common law incarnation, except the former is limited to staying within the realm of rights predefined by a contract." *In re: Kelvin Manbodh Asbestos Litig. Series*, 47 V.I. 267, 289 (Super. Ct. 2005); *accord Martin v. Frett*, 17 V.I. 474, 481 (D.V.I. 1980) (acknowledging distinction between contractual indemnification and tort-based indemnification which, like contribution, "merge[s] into comparative negligence."). But Virgin Islands courts also recognized that "[a]n election must be made." *Frederick*, 17 V.I. at 528 ("[A] party cannot seek recovery under both an express contract and common law tort principles."). Thus, the first factor favors continuing to recognize contractual indemnification, particularly given widespread acceptance by Virgin Islands courts. *Cf. Matthew*, 56 V.I. at 682 (noting absence of "single opinion" showed a lack of "widespread acceptance" of a cause of action and supported disallowing the cause of action).

¶39    Courts in other jurisdiction also recognize a cause of action for breach of an indemnity agreement. *E.g., Ramos v. Browning Ferris Indus., Inc.*, 510 A.2d 1152, 1159 (N.J. 1986) ("Indemnity contracts are interpreted in accordance with the rules governing the construction of contracts generally."); *Superintendent of Ins. of N.Y. v. Livestock Market Ins. Agency, Inc.*, 709 S.W.2d 897, 903 (Mo. Ct. App. 1986) ("In the case of an indemnity against liability, the covenant is breached, and the indemnitee becomes entitled to sue, as soon as the indemnitee incurs

liability, and actual loss need not be shown to recover."); *McClure v. Deerland Corp.*, 585 A.2d 19, 23 (Pa. Super. Ct. 1991) ("Under Pennsylvania law, a claim for recovery under an indemnification agreement is an action for breach of contract."); *Estate of Kriefall v. Sizzler U.S. Franchise, Inc.*, 816 N.W.2d 853, 869 (Wis. 2012) ("[C]laim here is . . . breach of the Hold Harmless Agreement, by which Excel promised to defend and indemnify E&B against claims such as those asserted by the non-Kriefall plaintiffs."); *Wyoming Johnson, Inc. v. Stag Indus., Inc.*, 662 P.2d 96, 102 (Wyo. 1983) ("[W]hen parties have entered into a written contract which includes an express indemnification provision, the express provision controls. It is inappropriate to enlarge or add rights of indemnification to the express provision by implication.").*see also W.R. Hall, Inc. v. Hampton Rds. Sanitation Dist.*, 641 S.E.2d 472, 472 (Va. 2007) ("[A] contractual provision whereby a party indemnifies itself against losses incurred as the result of personal injury caused by its own future negligence is enforceable and does not violate the public policy of the Commonwealth."). Thus, the second factor also favors recognizing a contractual indemnification claim as, essentially, a breach of contract claim.

¶40    The third and final factor, also the most important, is the most straight-forward here insofar as "the underlying purpose of contract law . . . is to hold parties to their agreements so that they receive the benefit of their bargains." *Phillip*, 66 V.I. at 621 (citations omitted). For over a century, businesses in the Virgin Islands have relied on the right to seek redress in our courts if an agreement is breached. *See id.* at 620 (collecting cases). And for the past several decades, the same has been true of indemnification agreements. (*Compare* IMC's Discovery Mot. 13 ("Just as HOVIC was required to produce information regarding the settlements it reached in *Dominic* and *Bainville*, it should also be ordered to produce such information in the *Catalyst* litigation herein."), *with* Hess Pls.' Amend. S.J. Mot. 6 ("The Third Circuit has already considered HOVIC's indemnification language to rule [sic] that it covers claims that contractor's employees assert against HOVIC." (citing *Bainville*, 837 F.2d 128)).) Virgin Islands businesses and residents, and companies doing business in the Virgin Islands, have assumed that Virgin Islands common law will let them agree among themselves how to allocate responsibility for loss, liability, injury, and damages and further, that Virgin Islands courts would enforce such agreements and provide a remedy if breached. "'The law of contracts is designed to effectuate exchanges and to protect the expectancy interest of parties to private bargained-for agreements.'" *Phillip*, 66 V.I. at 621 (quoting *State Farm Mut. Auto Ins. Co. v. Ford Motor Co.*, 592 N.W.2d 201, 206 (Wis. 1999)). In other jurisdictions, the legislatures have decided, as a matter of public policy, to prohibit some

forms of indemnification. *See, e.g., Langston v. Gonzalez*, 958 N.Y.S.2d 888, 897 (Sup. Ct. 2013) ("This indemnification provision is clearly void and unenforceable under General Obligations Law § 5-321 because it shifts the entire responsibility for any damages to the tenant regardless of the landlord's own negligence."); *Atwood Health Props., LLC v. Calson Constr. Co.*, 111 A.3d 311, 316 n.7 (R.I. 2015) ("General Laws 1956 § 6-34-1 provides that a subcontractor cannot be required to indemnify a general contractor for the general contractor's own negligence and that any indemnification agreement to the effect is void."); *cf. Arthur v. State*, 377 P.3d 26, 34 (Haw. 2016) ("The purpose of this Act is to invalidate, as against public policy, the prevalent practice in the construction industry of causing contractors to assume liability for the negligence of others by contract. Such so-called 'hold harmless' agreements are usually incorporated into contracts for construction projects on a 'take-it-or-leave-it' basis; (i.e., to take out the necessary insurance or leave the bidding to someone else), and frequently require the contractor, engineer or architect, for example, to undertake assumption of liability for personal injury or property damage even where the same results from the 'sole negligence' of persons over whom the indemnitor has no control or right of control." (citation omitted)). But the Virgin Islands Legislature has not weighed in on indemnification agreements, including agreements whereby one party agrees to indemnify another party for that party's own negligence. However, the Virgin Islands Supreme Court promulgated a rule that requires lawyers and law firms to indemnify the financial institution servicing client trust accounts. *See* V.I. S. Ct. R. 211.1.15-3(j) ("Every lawyer or law firm maintaining a trust account in the Virgin Islands shall, as a condition thereof, be conclusively deemed to have consented to the reporting and production requirements by financial institutions mandated by Rule 211.1.15-5 and shall *indemnify and hold harmless* the financial institution for its compliance with such reporting and production requirement." (emphasis added)).

¶41    Having considered all three factors, the Court concludes the soundest rule for the Virgin Islands is to continue to recognize a cause of action for breach of an indemnification agreement. "Indemnification agreements are contracts." *Stilley v. James*, 48 S.W.3d 521, 528 (Ark. 2001). And "'the parties are free, within the limits of public policy, to agree upon conditions precedent to suit.'" *Ario v. Underwriting Members of Lloyd's of London Syndicates 33*, 996 A.2d 588, 597 (Pa. Commw. Ct. 2010) (quoting *Cont'l Cas. Co. v. Stronghold Ins. Co., Ltd.*, 77 F.3d 16, 19 (2d Cir. 1996) (applying New York law)). The more challenging question—and the heart of the dispute here— is whether Virgin Islands common law should further recognize indemnification agreements

that shift one party's *entire* responsibility to another. The Hess Plaintiffs contend that both the 1986 purchase order and the 1994 maintenance service agreement have the same requirement to trigger the duty to indemnify: "(1) indemnities [sic] must be HOVIC or its affiliates, successors, and assigns, (2) the occurrences giving rise to the claim must be in connection to IMC's services, and (3) the indemnities collectively cannot be solely negligent for the claimed injuries." (Hess Pls.' Amend. S.J. Mot. 5.) This "solely negligent" clause is what the Court turns to next.

¶42    The Hess Plaintiffs contend that, if the jury had returned a verdict, Hess and HOVIC might have been found negligent, perhaps even 99.9% negligent. But so long as neither were found "solely negligent," meaning 100% at fault, and the other requirements were met,[17] then IMC (and

---

[17] Assuming the Hess Plaintiffs correctly state the conditions in their indemnification agreement with IMC to trigger IMC's duty, the amended motion still would have to be denied because Hess and HOVIC failed to submit proof regarding the first condition. Hess and HOVIC are not the same "person" under the law, a crucial distinction all parties overlook. *Cf. Hess Oil V.I. Corp. v. Fluor Daniel,* 2020 VI Super 50 (HOVIC filing case on behalf of Hess but without alleging an assignment of rights).. There is no dispute Hess and HOVIC were sued by several individuals and settled with them. Court records prove that fact. But whether IMC breached its agreement to indemnify Hess, HOVIC, or both is disputed. Yet, the Hess Plaintiffs failed to distinguish between themselves in their motion or address their respective burdens of proof. Instead, they proceeded as if they were one and the same with one contractual indemnification claim against IMC. The Hess Plaintiffs gloss over this distinction, noting that the Court should find as a matter of law that Hess was HOVIC's affiliate under the 1986 HOVIC-IMC agreement. (*See* Hess Pls' Amend. S.J. Mot. 5-6 ("Affiliate is a legal term of art meaning 'a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation.' It is undisputed that Hess is the parent company of HOVIC and thus is an affiliate of HOVIC. Therefore, the Court *should rule that both HOVIC and Hess are indemnities.*" (emphasis added) (quoting Black's Law Dictionary 23 (2d pocket ed. 2002)).

   The Legislature of the Virgin Islands has defined the term affiliate for certain purposes. *See, e.g.,* 9 V.I.C. §1 ("'Affiliate' means an [sic] corporation partnership, limited liability company business trust, or any other legal organization or entity that controls, is controlled by, or is under common control with another such entity."); *see also* 12A U.S.C. § 402(1) (defining affiliate for purposes of the Virgin Islands Uniform Debt-Management Services Act); 28 V.I.C.§ 171(a) (defining affiliate for purposes of the Virgin Islands Uniform Fraudulent Transfers Act). No court in the Virgin Islands has addressed how the common law should define "affiliate" or whether courts should adopt existing statutory definitions if applicable to harmonize the law. Even if the meaning of "affiliate" was not at issue here, material facts are still in dispute because the Court cannot find, on the present record at least, that IMC and HOVIC knew that Hess—a corporation headquartered in New York and organized under New Jersey law (per the Amended Third-Party Complaint)—was an "affiliate" under the 1986 purchase order. The relevant indemnification language HOVIC points to is not in the 1986 purchase order, but in a separate letter, dated July 28, 1986, which HOVIC's purchasing manager sent to IMC's president. (*See* Hess Pls' Amend. S.J. Mot., Ex. D (letter from Frank Keleman to Robert S. Lewis, dated July 28, 1986)).) In that letter, Keleman informed Lewis that HOVIC and IMC had agreed to modify their agreement, substituting language stating that IMC agreed to "defend, indemnify, hold harmless and release Hess Oil Virgin Islands Corp. and its affiliates, successors and assigns . . . specifically including but not limited to St. Croix Petrochemical Corp. (SCPC)." *Id.* The Hess Plaintiffs would have the Court conclude *ipse dixit* that a letter from HOVIC to IMC, without any signatures or indicia of acceptance, proves that IMC consented to the changes and, further, that IMC and HOVIC understood the term "affiliate" to include Hess, even though SCPC, but not Hess, was expressly named. The only reference in the present record of Hess being considered an affiliate of HOVIC under the 1986 purchase order is in another letter, dated January 26, 1994, which IMC's president sent to HOVIC's contract administrator, stating that "[t]he indemnity applies to HOVIC, Amerada Hess, and SCPC." (*See* Hess Pls' Amend. S.J. Mot, Ex. G. (letter from Rocco Colabella to Robert S. Lewis (Jan. 26, 1994)).) But then in the next sentence Lewis wrote that IMC would indemnify "HOVIC and its affiliates." *Id.* These discrepancies raise factual questions as to whether IMC and HOVIC understood that Hess was an affiliate under their 1986 purchase order and if so, when.

any other indemnitors) must assume 100% of Hess' and HOVIC's liability. If Hess and HOVIC are correct, IMC must reimburse each for the amounts they paid to settle with 49 Plaintiffs. Whether to recognize indemnification of this nature requires a separate *Banks* analysis because, at common law, it was the "general rule that contracts to relieve one from the consequences of his own negligence [we]re not favored in the law, and if possible are construed not to confer immunity from liability." *Pan Am. World Airways, Inc. v. United Aircraft Corp.*, 163 A.2d 582, 587 (Del. 1960).

¶43    No court since *Banks* has addressed whether the Virgin Islands should recognize an indemnification agreement in which one party passes its own liability entirely to another party and, if so, under what conditions. This question was extensively debated in the Virgin Islands in the past, however, making the first factor especially relevant here. In other words, unlike other areas where Virgin Islands courts may have turned to the Restatements without questioning their soundness, in this area Virgin Islands courts did not turn to the Restatements at all, and instead reasoned their way through in developing the law.[18]

¶44    First, some context is necessary. "Common law indemnity shifts the entire burden of loss from one party to another." *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex. 1987). By contrast, "a contract of indemnity is construed in accordance with the rules for the construction of contracts generally." *Rahmani v. Park*, 2011 Guam 7, ¶ 26; *accord Plumlee v. Monroe Guar. Ins. Co.*, 655 N.E.2d 350, 359 (Ind. Ct. App. 1995) ("Indemnification agreements are contracts and are

---

Further, and in contrast to the 1986 purchase order, IMC and HOVIC expressly agreed in the 1994 maintenance services agreement that IMC would "defend, indemnify, and release HOVIC *and its parent*, affiliates, successors and assigns" (emphasis added). (1994 Agmt ¶ 11.1, p. 8 (emphasis added).) This too raises a question why the parties included the term "parent" in the 1994 contract if, as the Hess Plaintiffs argue, IMC understood all along that affiliate meant Hess or was synonymous with HOVIC's corporate parent. Ultimately, this may not be a material dispute. IMC has not responded yet and may concede that Hess was an affiliate under either or both agreements. But the Court cannot assume as a matter of law from the present record that IMC knew that Hess was an affiliate of HOVIC. Instead each plaintiff, or third-party plaintiff, must carry its own burden of proof.

[18] The Hess Plaintiffs assert, by contrast, that "Virgin Islands Courts have routinely adopted the indemnification provisions of Restatement (Third) of Torts: Apportionment of Liability, both before and after *Banks*." (Hess Pls.' Supp. Br. 6.) But they are incorrect. The cases cited in their supplemental brief did apply the Restatements. *See id.* (citing *Davis v Sunrise Med. (US), LLC*, Civ. No. 2012-29, 2013 U.S. Dist. LEXIS 99711, *6-7 (D.V.I. July 17, 2013); *Whitecap Inv. Corp. v. Putnam Lumber & Exp. Co.*, Civ. No. 2010-139, 2013 U.S. Dist. LEXIS 39062, *16-17 (D.V.I. Mar. 21, 2013); *Vandenhouten v. Olde Towne Tours, LLC*, 52 V.I. 551, 559-60 (D.V.I. 2009); *Jacobs v. Roberts*, ST-14-CV-193, 2015 V.I. LEXIS 58, *8 (V.I. Super. Ct. May 21, 2015); *Peters v. V.I Water & Power Auth.*, ST-11-CV-219, 2013 V.I. LEXIS 65, *12-13 (V.I. Super. Ct. Oct. 7, 2013); *In re Kelvin Manbodh Asbestos Litig. Series*, 47 V.I. 375, 393 (Super. Ct. 2005). But each case except *Davis* involved *common law* indemnification, not *contractual* indemnification, and the Court finds *Davis* unpersuasive because the District Court uncritically applied the Restatements *after Banks* as if they were still binding, *see* 2013 U.S. Dist. LEXIS 99711 at *7 n.2 (citing 1 V.I.C. § 4), which was in error. *Cf. Bertrand v. Mystic Granite & Marble, Inc.*, 63 V.I. 772, 783 n.5 (2015).

governed by the law of contracts."). But contracts whereby the indemnitor holds the indemnitee harmless even for the indemnitee's own negligence are "somewhat unusual," *Rahmani,* 2011 Guam 7 at ¶ 26, and thus, "strictly construed." *Pugh v. Prairie Constr. Co.,* 602 N.W.2d 805, 809 (Iowa 1999). Thus, "as a general rule, a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting from its *own negligent acts* unless such intention is expressed in clear and unequivocal terms." *Rahmani,* 2011 Guam 7 at ¶ 27 (emphasis added). Herein lies the heart of the issue because the 1986 purchase order, as amended, provides that

> Seller shall defend, indemnify, hold harmless and release HESS OIL VIRGIN ISLANDS CORP. and its affiliates, successors and assigns . . . from and against any and all suits. actions, claims, demands, damages, liabilities, attorneys' fees. costs and related expenses which HOVIC may suffer oy reason of injury (including death) to any person, or damage to any property, excluding property owned by Seller, in any manner directly or indirectly caused, occasioned or contributed to in whole or in part, or claimed to be caused by, occasioned or contributed to in whole or in part, by reason of any act, omission, fault or negligence, whether active or passive, of the Seller, its subcontractors, or their officers, employees, agents or representatives, or of anyone for whose acts they are liable, or of anyone acting under their direction or control, or on its or their behalf, in connection with, or incident to, performance of the purchase order. Seller's aforesaid indemnity, hold harmless and release agreement shall not be applicable to any liability caused by the sole negligence or sole willful misconduct of HOVIC. In the event that it is determined that any liability was caused by the *sole negligence* or *sole willful misconduct* of HOVIC, then HOVIC shall reimburse Seller and/or its insurance carrier for all judgments and expenses incurred, including the costs incurred in defending any claim arising from such liability.

(July 28, 1986 letter). And the 1994 maintenance services agreement, which is largely identical, provides that:

> CONTRACTOR will defend, indemnify, and release HOVIC and its parent, affiliates, successors and assigns . . . against all claims, causes of action, damages, liabilities, attorneys' fees and related expenses (herein "Claims") which HOVIC may suffer or for which HOVIC may be liable, (whether such Claims result by reason of any other contract imposing or requiring the assumption of Claims by HOVIC), by reason of the actual or claimed injury (including death) to any person, or actual or claimed damage to any proper, (including loss of use) directly or indirectly caused or contributed to, or claimed to be caused or contributed to by reason of any act, omission or negligence, whether active or passive, of CONTRACTOR, (its employees or its subcontractors, or of anyone for whose acts they are liable, or of anyone acting under their direction or control, or in connection with, or incident to, performance of this Contract, unless caused by the *sole negligence* or *sole willful misconduct* of HOVIC. CONTRACTOR will do this notwithstanding the Virgin Islands Comparative Negligence Statutes, Title 5 V.I.C. Section 1451. In all cases covered hereunder, CONTRACTOR will initially defend HOVIC until it is judicially determined that any liability was caused by the *sole negligence* or *sole*

> ***willful misconduct*** of HOVIC exclusive of any fault of the plaintiff, plaintiff's
> employer, or any other party or non-party to the lawsuit. If it is so determined,
> HOVIC will reimburse CONTRACTOR or its insurance carrier for all judgments and
> expenses incurred, including the costs incurred by CONTRACTOR or its insurer in
> defending any Claims arising from such liability.

(1994 Maint. Servs. Agmt.)

¶45 In one of the earliest decisions regarding contractual indemnification, *Tropic Plumbing, Inc. v. Thomspon-Staret International, Inc.*, 8 V.I. 232, 239 (D.V.I. 1971), *rev'd* 8 V.I. 525 (3d Cir. 1972), the District Court rejected implying a duty on the part of a subcontractor to indemnify a contractor, concluding that "[a] party should not be held to suffer the consequences of another's mistakes, unless he has clearly and unmistakeably [sic] agreed to do so." On appeal the Third Circuit reversed, not because it disagreed with the District Court's reasoning, however. Rather, the appellate court concluded that the trial court had erred by resolving factual ambiguities on a motion for summary judgment. *See* 8 V.I. at 530. Judicial concern with ***implied*** contractual indemnification continued, however. Perhaps in response, all Virgin Islands cases after *Tropic Plumbing* involve express, or written, indemnification agreements. *Cf. Frederick*, 17 V.I. at 527 ("Hess originally sought indemnity under various alternative theories. However, at oral argument counsel for Hess conceded that their claim was being advanced on the basis of express contractual liability.").

¶46 *Frederick* involved a lawsuit by an employee of D & M Electric Company, Inc. ("D & M") against Hess,[19] and Hess' attempt to seek indemnification from D & M via third-party complaint for the money paid to Frederick to settle his claims. *Id.* at 525-26. After Frederick had agreed to settle with Hess, the court entered a stipulated judgment in favor of Frederick for $98,000. *Id.* at 526. D & M "did not contest the reasonableness of the stipulated judgment" and further "advanced $49,000 to be applied in satisfaction of the judgment . . . while reserving all of its rights against Hess in th[e] indemnity action." *Id.* In discussing Hess' rights, the court found that the contract between D & M and Hess was the only possible source of indemnity:

> [W]here a third party plaintiff seeks indemnification from the employer of the
> plaintiff for money paid to the employee for injuries sustained on the job, it is
> highly questionable whether any other basis of liability could be advanced.
> Indemnification under common law tort principles cannot be allowed since it
> would run contrary to the provisions of the Workmens' Compensation Act . . . .

---

[19] Both the District Court of the Virgin Islands and the United States Court of Appeals for the Third Circuit in their respective opinions abbreviated Hess Oil Virgin Islands Corporation as "Hess." Amerada Hess Corporation was not named as a party according to the caption. Thus, "Hess" in the *Frederick* opinions was HOVIC.

> Furthermore, a party cannot seek recovery under both an express contract and common law tort principles. An election must be made.... Therefore, in the matter *sub judice*, the respective rights of Hess and D & M must be determined by reference to their contractual agreements.

*Id.* at 527-28 (citations omitted). Because Hess and D & M had two different indemnification agreements (one in a purchase order; the other in a stand-alone contract), the court first found that the later contract controlled. *See id.* at 532 ("As between two inconsistent contracts the one later in time will prevail over the earlier contract." (citing 17 Am. Jur. 2d *Contracts* § 265 (1964))). The later agreement provided that D & M must indemnify Hess "for loss due to any injury connected with the work of D & M, unless the liability was attributable *solely* to Hess's negligence." *Id.* at 530 (emphasis added). Because Frederick and D & M were both found partly at fault, the court concluded that D & M had to indemnify Hess for the entire amount Hess paid to Frederick, since Hess was not found solely negligent. *Id.* at 534-35. The court still expressed concern, albeit in *dicta*, with the position Hess "seemed to take," that, no matter what, "unless Hess [was] 100% responsible for an injury," D & M would have to indemnify Hess for Hess' "own negligence." *Id.* at 530 n.2. "While this may have been Hess' intent," the court explained, the indemnification agreement was "not sufficiently clear and unequivocal to allow Hess indemnity for its own negligence." *Id.* "The word 'solely' creates some question," the court reasoned, but any "doubt is resolved against Hess, who both drafted the agreement and seeks indemnity from its own negligence." *Id.*

¶47 The Third Circuit affirmed. *See Frederick*, 642 F.2d at 55. The court agreed that "the exclusive remedy section of the Virgin Islands Workmen's Compensation statute would prevent a direct action in negligence against D & M," but "nothing in that or any other Virgin Islands law prohibits an indemnity agreement" with an employer. *Id.* at 54. The court rejected D & M's argument that it was being forced to "indemnify Hess for Hess' own negligence," concluding that neither party "introduced any evidence of Hess' negligence." *Id.* at 55. "Perhaps what is meant," the Third Circuit explained, "is that because the parties stipulated to a $98,000 judgment, Hess's negligence is established as a matter of law. But the indemnity agreement indemnifies against all demands, loss or liability." *Id.* Even if Hess's "actual negligence been proved"—in addition to the negligence of Frederick and D & M—"the contract would still apply," the court concluded. *Id.* Hess was not solely negligent, so D & M must indemnify Hess.

¶48 Chief Judge Collins J. Seitz dissented. He reasoned that both "the district court and the majority . . . have misinterpreted the indemnity agreement" and "overlooked" "an important

issue" "that should be resolved by the application of traditional indemnity principles." *Id.* at 55

(Seitz, C.J., dissenting). The dissent pointed out that the agreement had two different triggers: a

demand and a loss or liability. D & M agreed to indemnify Hess only for its own, meaning D &

M's, negligence. "Frederick's complaint d[id] not allege any negligence on the part of D & M or its

agents," so Frederick's demand could not have triggered D & M's duty to indemnify Hess. *Id.* at

55-56 (Seitz, C.J., dissenting). The dissent further reasoned that because

> [t]he trier of fact ultimately found that Hess was not negligent . . . it could not have
> been held liable in the Frederick action for any injuries caused by an "act or
> neglect" of D & M or its agents. The district court, however, stated that Hess' right
> to indemnification should be determined "without regard to what may have been
> the result in a trial." Thus, the district court . . . interpreted "loss or liability" to
> mean a *potential* loss or liability *at the time of settlement.* But the indemnity
> agreement sheds no light on whether D & M's obligation to indemnify is triggered
> by compensation paid by Hess in response to a *potential loss or liability.* Because
> the intent of the parties cannot be ascertained by the terms of the agreement, it is
> necessary to refer to traditional indemnity principles to determine whether Hess
> must show potential or actual liability before it is entitled to indemnification.
>
>    The general rule is that the indemnitee . . . must show *actual* liability. Many
> courts, however, hold that the indemnitee must show only *potential* liability if it
> settles a claim for a reasonable amount after giving the indemnitor an opportunity
> to approve the settlement or to defend the primary action.
>    The decision whether to require actual liability in all situations or to
> recognize a potential liability exception is an important one. On the [one] hand, if
> actual liability is always required, settlements will be discouraged because of the
> difficult burden placed upon the indemnitee to establish its right to
> indemnification. On the other hand, the rule adopted must not be unfair to the
> indemnitor, who should be able to show that the indemnitee was not under a legal
> compulsion to pay the settled claim. Because the district court did not have an
> opportunity to review these principles and apply them to the present case, I
> believe that it is inappropriate to do so on appeal, especially given the record
> before us. Therefore, in the interest of fairness, I would vacate the judgment of the
> district court and remand for proceedings consistent with this opinion.

*Id.* at 56 (Seitz, C.J., dissenting) (emphasis added) (citations and footnote omitted). It is this

dispute whether "actual" or "potential" liability must be shown before a "sole liability" provision

is triggered is the question before the Court.

¶49    Contractual indemnification resurfaced after *Frederick* in the *Beloit* line of cases. *See* 19

V.I. at 521-22 ("At issue in this lawsuit is which party must either ultimately bear the entire

burden of paying a sizeable civil judgement [sic] entered against the plaintiff in . . . *Norwilton*

*Murray v. Beloit Power Systems, Inc.* . . . or . . . shar[e] the load with plaintiff Beloit Power Systems,

Inc." (hereinafter "*Beloit I*"). Beloit sold equipment to HOVIC for use at the oil refinery and HOVIC

contracted with Litwin to install it. *Id.* at 522. The plaintiff, Murray, worked for Litwin. *Id.* He was seriously injured while installing the equipment and sued Beloit, claiming strict liability and negligence. *Id.* He could not sue his employer, Litwin, because of the Workers' Compensation Act. The jury found Beloit 95% at fault and Murray 5% at fault. *Id.; see also Murray v. Beloit Power Sys., Inc.,* 79 F.R.D. 590, 591 (D.V.I. 1978), *aff'd sub nom Murray v. Fairbanks Morse,* 16 V.I. 647 (3d Cir. 1979). The verdict was affirmed on appeal.

¶50    Beloit's insurer, Kemper Insurance Company, satisfied the judgment and filed a new lawsuit with Beloit as co-plaintiff for contractual indemnification from HOVIC. *See Beloit I,* 19 V.I. at 522. HOVIC brought Litwin in by third-party complaint, alleging that "if HOVIC owes anything to Beloit, then through the operation of an indemnity provision in HOVIC's contract with Litwin, Litwin is required to indemnify HOVIC." *Id.* The agreement between Beloit and HOVIC had provided that

> [u]nder no circumstances shall . . . [Beloit] have any liability for . . . claims of . . . negligent manufacture or otherwise. The aggregate total liability of . . . [Beloit] under this contract, whether for breach of warranty or otherwise, shall in no event exceed the contract price. [HOVIC] agrees to indemnify and hold harmless [Beloit] from all claims by third parties which extend beyond the foregoing limitations on [Beloit's] liability.

*Id.* at 523. By contrast, the agreement between Litwin and HOVIC provided only that Litwin must "indemnify and hold HOVIC harmless from and against any and all loss, damage, injury liability and claims thereof, including claims for personal injuries, death and property damage and loss, unless caused by the *sole negligence* of HOVIC." *Id.* at 532 (emphasis added).

¶51    The District Court turned to the Beloit-HOVIC contract first, observing that "for a party to be contractually indemnified for its own negligence, such an intention must be clearly and unambiguously expressed in the contract." *Id.* at 524. Courts must be "firmly convinced," the District Court reasoned, "that such an interpretation reflects the intention of the parties," finding "[t]his principle . . . accepted with virtual unanimity among American jurisdictions." *Id.* (quoting *United States v. Seckinger,* 397 U.S. 203, 211 (1970)). Further, the party seeking indemnification has the burden and "[t]his burden is even greater where the party seeking indemnification drafted the language." *Id* Beloit failed to carry its burden, the court found, because the contract did "not clearly or unequivocally show an intention that Beloit be indemnified for third party personal injury claims caused by Beloit's negligence." *Id.* at 525. Since Beloit included the indemnification language, "any ambiguity" had to "be construed 'most strongly' against Beloit as drafter," the court found. *Id.* at 524. Beloit couched the indemnity language "in contract and

warranty terms, with the exception of the final two sentences which neither mention personal injury claims or indemnification for Beloit's own negligence." *Id.* at 526-27. A "mention of negligent manufacture' in connection with language limiting warranty or contract claim . . . is [in]sufficient to demonstrate a clear intention that Beloit be indemnified for personal injury claims caused by its negligent manufacture of its product," the court concluded. *Id.* at 527. Relying on other cases, including *Draper v. Airco, Inc.*, 580 F.2d 91, 101 (3d Cir. 1978), with clearer language, the court rejected Beloit's interpretation and granted summary judgment in favor of HOVIC. *See id.* at 530, 533.

¶52    Turning to the Litwin-HOVIC agreement, the District Court rejected Litwin's contention that it never agreed to indemnify HOVIC for HOVIC's own negligence. The court reasoned that, if HOVIC were found liable, then there would "be at least three tortfeasors," *id.* at 533, Beloit, Murray, and HOVIC. Consequently, Murray's, "injuries would not have been caused by the 'sole-negligence of HOVIC.' Thus, according to the indemnity provision, HOVIC is entitled to indemnification from Litwin," *id.* at 533, the court concluded. If HOVIC were "found to be the *only* negligent party," *id.* (emphasis added), then Litwin would not have a duty to indemnify. But since HOVIC was not the only negligent party, Litwin had to indemnify HOVIC.

¶53    On appeal, the Third Circuit, in separate opinions,[20] reversed the Beloit-HOVIC decision and affirmed the Litwin-HOVIC decision. *See generally* 757 F.2d at 1431 (Beloit-HOVIC) (hereinafter "*Beloit II*"); 757 F.2d at 1434 (Litwin-HOVIC) (hereinafter "*Beloit III*").[21] The Third Circuit disagreed with the District Court about the Beloit-HOVIC contract, finding the language sufficient to pass liability from Beloit to HOVIC. "It is . . . hard to imagine language that would be more absolute or unequivocal," the Third Circuit concluded, than "all claims by third parties." *Beloit II*, 757 F.2d at 1430. The appellate court rejected the trial court's concerns about manufacturers potentially escaping all liability for negligently manufacturing products. *See Beloit I*, 19 V.I. at 530 (expressing "concerns against allowing a party to indemnify himself against his own negligence," which were "even greater in a products liability context, where the purpose is to impose liability for defective products on the manufacturer." (citing *Price v. Shell Oil Co.*, 466

---

[20] Because the contribution claims remained, the decision was not a final, appealable order, so the District Court certified it for interlocutory appeal, which the Third Circuit accepted. *See* 757 F.2d at 1429.

[21] Whereas this Court uses *Beloit I* to refer to the trial court's decision and *Beloit II* and *Beloit III* for the appellate court's decisions, the Third Circuit, in *Eastern Airlines*, used "*Beloit I*" and "*Beloit II*," respectively, to refer to its opinion. The distinction is noted here to avoid confusion.

P.2d 722, 730 (Cal. 1970) (*en banc*)). Rejecting "anachronistic aversion to contracts that indemnify the indemnitee against losses resulting from its own negligence," *Beloit II*, 757 F.2d at 1431, the Third Circuit concluded that "[t]he law now permits the indemnitee to recover for its own negligence if the court is firmly convinced that such an interpretation reflects the intention of the parties." *Id.* (citing *Seckinger*, 397 U.S. at 211). Beloit had submitted an affidavit from its negotiator with HOVIC, John Ivey, in which Ivey explained that Beloit had rejected HOVIC's standard terms and insisted instead on full indemnification, which HOVIC agreed to. This proof, the appellate court found, was un-rebutted by HOVIC and not considered by the trial court, and it showed that HOVIC had agreed to indemnify Beloit for all claims against Beloit.

¶54    The Third Circuit did agree with the District Court regarding the Litwin-HOVIC contract, however, concluding that, since "Beloit had already been found to be negligent in the action brought by Murray, his injury could not have been caused by" HOVIC's "sole negligence." *Beloit III*, 757 F.2d at 1433. "Since the jury in the *Murray* action found Beloit liable" for negligence and strict liability, *id.*, "the loss was, at least in part, the responsibility of a party other than [HOVIC]," the court reasoned. *Id.* So, "under these circumstances, the indemnity agreement was applicable" and the District Court correctly concluded that Litwin must indemnify HOVIC. *Id.* The Third Circuit further agreed with the District Court regarding the requirement to obtain insurance. The District Court had found that, because "the indemnity provision [wa]s tied to a provision requiring" Litwin to "purchase insurance for the risks enumerated in the indemnity provision," it "evidences a conscious risk shifting, the function of which is to allocate the burden of procuring insurance." *Beloit I*, 19 V.I. at 529. The Third Circuit concurred. "This agreement, unlike that between Hess as buyer and Beloit as seller . . . arises in the paradigmatic context of a contractor and the owner, and hence the insurance provision does . . . manifest an intent to shift the risk to Litwin." 757 F.2d at 1433 (internal citations omitted).

¶55    In an effort to harmonize the two opinions, the Third Circuit acknowledged a concern Litwin had raised—if HOVIC must indemnify Beloit and Litwin must indemnify HOVIC—that it would be "indemnity on indemnity." *Id.* at 1434. But the appellate court dismissed the concern, noting that Litwin did not agree to indemnify HOVIC for *contractual* liability, only *tort* liability. *Id.* at 1434. The court did concede, however, that the result would

> present a somewhat anomalous situation on remand, since it will be to [HOVIC's] advantage to maximize the amount of its own negligence vis-a-vis Beloit, and thereby increase the amount of the indemnity for which Litwin will be responsible. Furthermore, Beloit, having succeeded on its claim that [HOVIC] must indemnify

> it in the full amount of its payment to Murray, less the contract price, no longer
> has an interest in the outcome of the remainder of this litigation.

*Id.* But this was the "unavoidable result," the court reasoned, "of the juxtaposition of the two indemnity contracts entered into by the parties," particularly "[s]ince neither Litwin nor Hess apparently sought to intervene in the Murray action." *Id.*

¶56 On the heels of the *Beloit* trilogy came *Eastern Airlines, Inc. v. Insurance Company of North America*, 758 F.2d 132 (3d Cir. 1985). Decided the same day as *Beloit II and III* and by the same panel, *Eastern Airlines* also involved an indemnity agreement and a "sole negligence" clause. Eastern Airlines had contracted with ABC Services to provide custodial services at the airport on St. Thomas. 758 F.2d at 132. Brenda Bedford, an employee of ABC Services ("ABC"), injured her back on the job. *Id.* at 133. She sued Eastern and Eastern demanded that ABC take over the defense of the lawsuit under an indemnification agreement. ABC's insurance company, Insurance Company of North America ("INA"), refused, initially, to provide counsel, but once the first trial ended in a hung jury, it assumed the defense, reserving "the right to challenge its obligation to pay any judgment awarded or costs of defending the suits." *Id.* The jury in the second trial found Bedford twenty percent at fault and Eastern eighty percent. Since INA had "continued to deny any obligation to pay Eastern under the indemnity agreement," Eastern filed its own "action for declaratory judgment against INA to determine the rights and obligations of the parties." *Id.*

¶57 The District Court, in the declaratory judgment action, ruled in favor of Eastern on cross motions for summary judgment. On appeal, the Third Circuit rejected the insurance company's argument that, because the agreement did not say that ABC would indemnify Eastern for "Eastern's own negligence, it should not be construed." *Id.* at 134. Citing *Beloit II*, the court concluded that "if the language is sufficiently broad and unambiguous" "an indemnity provision need not specifically refer to the indemnitee's negligence. . . ." *Id.* The court also concluded, citing *Beloit III*, that ABC's obligation "to secure insurance 'manifest[ed] an intent to shift the risk.'" *Id.* (quoting 757 F.2d at 1433). And to the broader public policy concerns INA raised, the Third Circuit resoundingly rejected them.

> The widespread use of sole negligence provisions may be explained in part by the reluctance of many courts to enforce an all-inclusive indemnity provision. Instead, they read such language as if there were an additional provision whereby injuries caused by the sole negligence of the indemnitee were excepted from the scope of the indemnity provision. Even now, in some jurisdictions, a provision which guarantees indemnification for the sole negligence of the indemnitee is void as

against public policy. Thus, sole negligence provisions may have evolved because of a belief that they were judicially required or would preserve an otherwise invalid broad indemnity provision. Moreover, by imposing on the indemnitee the obligation to bear the cost when its own negligence was the only cause of the injury, a sole negligence clause reflects the concern about fairness which underlay some of the judicial decisions. This may also account for what appears, at least from the reported cases, to be its present widespread use.

On the other hand, this court has already concluded that there is no public policy that prevents judicial enforcement of the parties' agreement to shift the cost of or liability for the consequences of one's own negligence, provided it is done clearly and unambiguously. We do not share the aversion of some courts to contractual efforts to shift the perceived risks among the parties to a business transaction.

. . . [T]here are a plethora of suits by injured workers against owners of premises. Those suits are brought in many instances as attempts to escape the limitations of workmen's compensation and are often encouraged by workmen's compensation carriers seeking subrogation recoveries. Exposure to such liability explains why owners seek to have contractors and subcontractors bear the risk of insuring against claims by their own workers. If we were to adopt INA's position and disregard the employee's own negligence in applying the sole negligence exception, the exception would preclude use of the indemnity provision in one of the primary circumstances for which indemnity was intended.

We have recently rejected the claim that a sole negligence clause must be construed by looking only at the negligence of the indemnitee vis-a-vis the indemnitor. We held that if a third party also bears some of the responsibility for the injury, the sole negligence provision is inapplicable. In fact, in that case, the indemnitor was not itself negligent, but we held that was irrelevant for purposes of enforcing the obligation it had undertaken.

Whatever the reason for Eastern's willingness to bear the liability when it was solely negligent, it is apparent that it was not willing to do so if someone else was also responsible. The language of the indemnity contract at issue here explicitly contemplates the possibility that ABC's employees may be injured, and also that their acts may cause injury. ABC's agreement to indemnify Eastern specifically covers Eastern's liability arising out of or resulting from any acts of ABC's employees. Bedford's negligence clearly meets this description, and we see nothing in the language of the sole negligence clause that requires a different result simply because her negligence caused injury only to her.

. . . .

The basis for ABC's responsibility in this case is not imputed negligence, the theory of *respondeat superior*, but instead a specific contractual obligation. Therefore, we need not determine whether Bedford's negligence will be imputed to ABC; ABC agreed to be responsible to Eastern for what she did.

*Id.* at 134-36 (internal quotation marks, citations, and alterations omitted).

¶58    Judge John J. Gibbons dissented, concluding that "the 'sole negligence' provision of the indemnity agreement" should be construed "to mean that Eastern is not entitled to indemnification when its liability for damages is solely attributable to its own negligence." *Id.* at

136 (Gibbons, J., dissenting). "The exception" for sole negligence, he explained,

> should ... mean that the indemnitor is liable in every instance in which some party
> other than the indemnitee has engaged in conduct resulting in the indemnitee's
> liability to a claimant. Contributory negligence is not conduct resulting in liability
> to the claimant because the claimant's award is reduced in proportion to his or her
> own negligence. The only party which engaged in conduct resulting in liability to
> a claimant is Eastern Airlines. Thus the sole negligence exception to the indemnity
> undertaking should apply. Construing the contract language as the majority does
> wrenches it from its context.

*Id.* (Gibbons, J., dissenting).

¶59     After the *Beloit* and *Eastern Airlines* cases were decided, questions whether tort liability could be discharged by contract ended. *Cf. Firemen's Fund*, 22 V.I. at 143 ("There is no public policy which prevents judicial enforcement of an agreement to shift liability for the consequences of one's own negligence. There is no longer any question that such agreements are enforceable." (internal citations omitted)); *see also Dominic*, 624 F. Supp. at 119 ("Repeatedly the circuit court has held that there is no public policy which prevents judicial enforcement of an agreement to shift liability for the consequences of one's own negligence.").

¶60     Turning to the second factor, the Supreme Court of the United States summarized the different approaches courts have taken to "sole negligence" clauses in *United States v. Seckinger*:

> A number of courts take the view, frequently in a context in which the indemnitee
> was solely or principally responsible for the damages, that there can be
> indemnification for the indemnitee's negligence only if this intention is *explicitly*
> stated in the contract. ... Other cases do not require that indemnification for the
> indemnitee's negligence be specifically or expressly stated in the contract if this
> *intention* otherwise *appears* with clarity.

397 U.S. at 211 n.15 (citations omitted) (emphasis added). Thus, the question boils down to whether an agreement to assume liability for another's negligence must be stated in clear and explicit terms, or whether courts can look to the intent of the parties. How Nevada approached the same question is instructive here. *Cf. Connor*, 60 V.I. at 603 ("The second step ... directs the Superior Court to consider all potential sides of an issue by viewing the potentially different ways that other states and territories have resolved a particular question.").

¶61     The United States District Court for the District of Nevada "assume[d]" in *Aetna Casualty and Surety Company v. L.K. Comstock and Company, Incorporated*, 488 F. Supp. 732, 742 (D. Nev. 1980), *rev'd*, 684 F.2d 1267 (9th Cir. 1982), "that Nevada would follow" what it believed was "the more enlightened view," even though it was "the modern minority view." And the modern minority view of sole negligence indemnification agreements provides

that an indemnity provision "for any and all liability" means all liability, including that arising from the indemnitee's concurrent negligence. This rule rejects the majority's rationale that one person indemnifying another person for the other's own negligence is such an unusual or hazardous situation that close judicial interpretation is called for. Instead, the minority view is that such indemnity contracts are so common in the modern business world that courts should leave the parties with their bargain for "any and all liability."

*Id.* The United States Court of Appeals for the Ninth Circuit reversed, but not because the District Court adopted the minority approach. *See* 684 F.2d at 1273. Instead, the appellate court concluded that the indemnification agreement was void under Nevada's workers compensation statute "to the extent that it indemnifies a third party against damages paid to the employer's employees as the result of an industrial accident *Id.* at 1272. Judge William A. Norris dissented, reasoning that "all federal and state courts . . . recognize that an express indemnity contract is an exception to an employer's otherwise exclusive liability under a state worker's compensation scheme" except Alabama "whose courts stand alone in their refusal to follow the mainstream of worker's compensation decisions involving express indemnity contracts." *Id.* at 1273 (Norris, J., dissenting). The dissent concluded that "if the Nevada Supreme Court were to address the issue squarely, it would look to the well-reasoned decisions of other jurisdictions and hold that the Nevada worker's compensation scheme does not void express indemnity contracts between an employer and a third party." *Id.* at 1275 (Norris, J., dissenting). Neither opinion addressed the majority or minority rule.

¶62 Some thirty years later, the Supreme Court of Nevada overwhelmingly rejected *Aetna's* prediction. *See George L. Brown Ins. Agency, Inc. v. Star Ins. Co.*, 237 P.3d 92, 97 (Nev. 2010).

We reject the rationale of the so-called minority rule because a general clause is **not sufficient** to impose such an extraordinary remedy. Instead, we adopt the majority rule—an express or explicit reference to the indemnitee's own negligence is required to indemnify an indemnitee for his or her own negligence—because "the character of such an indemnity is so unusual and extraordinary, that there can be no presumption that the indemnitor intended to assume the responsibility unless the contract puts it beyond doubt by express stipulation, and no inference from words of general import can establish it."

*Id.* (brackets omitted) (emphasis added) (quoting 41 Am. Jur. 2d *Indemnity* § 16 (2005)). The Nevada Supreme Court viewed the minority approach as permitting "too much to be read into the terms of a contract that the parties may not have intended [which] could substantially benefit one party to the extreme detriment of the other." *Id.* The majority approach, however, permits "the wrongdoer [to] face[] the consequences of his or her actions rather than 'casting the burden

of negligent actions upon those who were not actually at fault.'" *Id.* (brackets omitted) (quoting *Seckinger*, 397 U.S. at 212).

¶63 One Virgin Islands decision also addressed the minority approach in depth before rejecting it. In *Damidaux v. Hess Oil Virgin Islands Corporation*, Case No. 55/1978, 1981 U.S. Dist. LEXIS 10733, *4 (D.V.I. Feb. 19, 1981), a Territorial Court judge sitting by designation in the District Court of the Virgin Islands, examined "[t]he modern minority rule . . . discussed and adopted in *Aetna*." The *Damidaux* court did not believe that

> indemnity for another's negligence [w]as an ordinary business arrangement. It is not simply analogous to an insurance contract. With insurance, the contract is centered on the reimbursement arrangement; the bargain between the parties is money exchanged for protection against claims. An indemnity contract . . . is often a minor clause in a contract that is centered on work exchanged for money. . . . [T]he indemnitor is usually the party who did not draft the contract, and coincidentally the party with less bargaining power. It is a harsh obligation to require this party to pay for indemnitee's own negligence. The argument that this is in practice simply a method of arranging which party should obtain insurance is not convincing. Both parties will often have insurance in the commercial context: the conflict is over which insurance company will be liable. While some contracts will specify which party must buy insurance for the negligence of both, the scope of indemnification is a function of the words of the contract, not the scope of insurance.
>
> For the same reason of insurance, the argument that it should be against public policy to indemnify a party against its own negligence is decried – insurance will protect a company from its own negligence in any case. Yet some vitality may remain to this point: an insurance company may respond to a lawsuit it defends and loses by raising its rates or suggesting new methods of operation for the company – the negligent company will probably not be unaffected. The indemnitor is likely in a much weaker position to affect the negligent indemnitee's future actions.
>
> Finally, from a moralistic perspective there is a significant difference between the insurance and indemnity contexts. There seems nothing wrong in requiring an insurance company to "pay up". The insurance company has received tangible benefits in return for subjecting itself to the business risk that it may be compelled to reimburse its insured. Yet requiring a company to indemnify another's negligence has an aura of unfairness. If this were always a method of allocating the burden of insurance, the Court would not be troubled – but this rationale will not be relied on absent such universal practice. The suspicion still lurks that often a weak or naive party will be the indemnitor of another's negligence. The *notice aspect of specific, clear and unequivocal language operates as appropriate protection for such parties. If parties truly do wish one party to indemnify another's negligence, specificity is not too onerous a burden* . . . .

*Id.* at *4-6. *Damidaux* did not carry the day. In fact, no court cited it. But the concerns it raised

are still relevant today. *Accord George L. Brown Ins. Agency, Inc.*, 237 P.3d at 97; *Ethyl Corp.*, 725 S.W.2d at 708; *cf. Rahmani*, 2011 Guam 7 at ¶ 33.

¶64    Unlike *Aetna, George L. Brown*, and *Damidaux*, most courts have not characterized the different approaches as minority or majority. But the *Restatement (Third) of Torts: Apportionment of Liability*, while not using either term explicitly, does distinguish between cases that require "clear and unequivocal language" with those that "do not require particular words." *Restatement (Third) of Torts: Apportionment of Liability* § 22 cmt. f (2000) (collecting cases). *See also Rahmani*, 2011 Guam 7 at ¶ 28 ("Courts have split on the question of how the clear and unequivocal requirement is met when the requirement is applied to indemnity provisions that contain general language such as 'any and all claims.'" (citation omitted)). And whether characterized as a "minority" or "majority" approach, the question ultimately is whether language in an agreement allowing A to pass liability to B for A's own negligence must be clear and unambiguous or determined by the intent of the parties.[22] This same dichotomy is also borne out in the *Beloit* and *Eastern Airlines* decisions: broad language and intent of the parties versus clear and unambiguous language.

¶65    Having considered the past approach taken by Virgin Island courts, and the approaches

---

[22] *Compare, e.g., Westinghouse Elec. Corp. v. Williams*, 360 S.E.2d 411, 413 (Ga. Ct. App. 1987) ("'In the absence of *explicit language* to the contrary, courts will not interpret an indemnity agreement as a promise by the indemnitor to save the indemnitee harmless on account of the latter's own negligence.'" (emphasis added) (citation omitted)); *McNally & Nimergood v. Neumann-Kiewit Constrs., Inc.*, 648 N.W.2d 564, 571 (Iowa 2002) ("[I]ndemnification contracts will not be construed to permit an indemnitee to recover for its own negligence unless the intention of the parties is *clearly and unambiguously expressed*. It is also the prevailing rule in other jurisdictions. The traditional reluctance of courts to allow the burden of one who is negligent to be transferred to another who is not at fault, especially where there is a disparity in the bargaining power and economic resources of the parties, can be traced to public policy considerations." (emphasis added) (citations omitted)); *Ramos v. Browning Ferris Indus., Inc.*, 510 A.2d 1152, 1159 (N.J. 1986) ("[A] contract will not be construed to indemnify the indemnitee against losses resulting from its own negligence unless such an intention is *expressed in unequivocal terms*." (emphasis added) (citations omitted)); *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993) ("Because indemnification of a party for its own negligence is an extraordinary shifting of risk, this Court has developed fair notice requirements which apply to these types of agreements. The fair notice requirements include the express negligence doctrine and the conspicuousness requirement. The express negligence doctrine states that a party seeking indemnity from the consequences of that party's own negligence must *express that intent in specific terms* within the four corners of the contract. The conspicuous requirement mandates 'that something must appear on the face of the contract to attract the attention of a reasonable person when he looks at it.'" (citations and brackets omitted)), *with, C.J.M. Constr. Inc. v. Chandler Plumbing & Heating, Inc.*, 708 P.2d 60, 64 (Alaska 1985) ("It is no longer necessary under Alaska law that an indemnity clause contain words specifying indemnity for the indemnitee's own negligence."); *Bartlett v. Davis Corp.*, 547 P.2d 800, 808 (Kan. 1976) ("Although recognizing the general rule, a great majority of courts hold that it is not necessary that the agreement contain specific or express language covering the owner's negligence, if the intention to afford such protection clearly appears from the contract, the surrounding circumstances and the purposes and objects of the parties."); *Drzewinski v. Atl. Scaffold & Ladder Co.*, 515 N.E.2d 902, 904 (N.Y. 1987) ("A party is entitled to full contractual indemnification provided that the 'intention to indemnify can be *clearly implied* from the language and purposes of the entire agreement and the surrounding facts and circumstances.'" (emphasis added) (quoting *Margolin v. N.Y. Life Ins. Co.*, 297 N.E.2d 80, 83 (N.Y. 1973)).

taken by other courts around the country, this Court holds that the soundest rule for the Virgin Islands is to follow the majority approach and adopt the express negligence doctrine. "[S]pecificity is not too onerous a burden." *Damidaux*, 1981 U.S. Dist. LEXIS 10733 at *6. "The express negligence doctrine provides that parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms." *Ethyl Corp.*, 725 S.W.2d at 708. The observations of the Supreme Court of Texas, concerning its journey from "clear and unambiguous" to "express negligence" is instructive here:

> As we have moved closer to the express negligence doctrine, the scriveners of indemnity agreements have devised novel ways of writing provisions which fail to expressly state the true intent of those provisions. The intent of the scriveners is to indemnify the indemnitee for its negligence, yet be just ambiguous enough to conceal that intent from the indemnitor. The result has been a plethora of law suits to construe those ambiguous contracts. We hold the better policy is to cut through the ambiguity of those provisions and adopt the express negligence doctrine.

*Id.* at 707-08. "Under the doctrine of express negligence, the intent of the parties must be specifically stated within the four corners of the contract." *Id.* at 708; *accord Rahmani*, 2011 Guam 7 at ¶ 33 ("Thus, we hold that an indemnity provision in a lease agreement will not be construed to indemnify the indemnitee against losses resulting from its own negligent acts unless such intention is expressed in clear and unequivocal terms, and words of general import that do not specifically reference an indemnitee's negligence do not satisfy the clear and unequivocal requirement.").

¶66    In this instance, examining the approach Virgin Islands courts have taken in the past has been key, requiring careful consideration before "'disrupting the state of the law in the Virgin Islands' by modifying" our past approach. *Walters*, 60 V.I. at 776 (brackets omitted) (quoting *Banks*, 55 V.I. at 981). Clearly, Virgin Islands companies and companies doing business in the Virgin Islands have come to rely on the *Frederick*, *Dominic*, *Beloit*, and *Bainville* lines of cases, including the parties to these cases. The Court also acknowledges that, during all times relevant to this litigation, the District Court of the Virgin Islands functioned as the main source of Virgin Islands jurisprudence. *Cf. Maynard v. Rivera*, 56 V.I. 885, 893-94 (3d Cir. 2012) ("[W]ith the creation of the Superior Court of the Virgin Islands (formerly the Territorial Court), the District Court has long been divested of original jurisdiction over matters arising purely under territorial law. An inexorable consequence of divestment was the District Court's inability to continue contributing to the development of Virgin Islands local law." (citations omitted)); *accord People v. Parrilla*, 58 V.I. 148, 160 (Super. Ct. 2013) ("As this Court's jurisdiction expanded through

legislative enactment, the Court necessarily looked to the district court's jurisprudence and rules for guidance."). Likewise, the United States Court of Appeals for the Third Circuit served as *the de facto* supreme court for the Virgin Islands until the Supreme Court of the Virgin Islands assumed appellate jurisdiction in 2007. *Cf. Rawlins v. People*, 61 V.I. 593, 610 n.10 (2014) ("The Third Circuit served as the *de facto* court of last resort for the Virgin Islands before this Court commenced operations in 2007."). Clearly, the *Frederick, Dominic, Beloit,* and *Bainville* line of cases "are 'entitled to great respect.'" *Garcia v. Garcia*, 59 V.I. 758, 776 (2013) (citation omitted). But that does not make their decisions binding. *Cf. Connor*, 60 V.I. at 605 n.1. In fact, in explaining why the District Court erred in *Beloit II*, the Third Circuit provided the very reason why this Court must exercise its concurrent authority, *see id.* at 604, to decline to follow this past precedent.

¶67    The District Court relied on *K & S Oil Well Service, Inc. v. Cabot Corporation*, 491 S.W.2d 733 (Tex. Civ. App. 1973), a state court decision, to reject the conclusion that the Beloit-HOVIC contract required Beloit to indemnify HOVIC for HOVIC's own negligence. *See Beloit I*, 19 V.I. at 526. The Third Circuit rejected the Texas case, *see Beloit II*, 757 F.2d at 1430-31, in part based on *Seckinger*, which "appli[ed] federal law," *id.* at 1430, and based on prior Third Circuit precedent, where the court concluded "that 'a broadly worded indemnification clause need not also recite the specific sorts of loss within its coverage.'" *Id.* (quoting *First Jersey Nat'l Bank v. Dome Petroleum Ltd.*, 723 F.2d 335, 340 (3d Cir. 1983)) (citing *Draper*, 580 F.2d at 101; *Jamison v. Ellwood Consolidated Water Co.*, 420 F.2d 787, 788-90 (3d Cir. 1970)). But those prior cases had applied New Jersey and Pennsylvania law, respectively. *Cf. Beloit II*, 757 F.2d at 1430. In fact, in all three cases, *Beloit II, Beloit III,* and *Eastern Airlines*, the Third Circuit relied almost exclusively on federal precedent, even though the question at issue in each case involved Virgin Islands common law and whether Virgin Islands "public policy . . . prevents judicial enforcement of the parties' agreement to shift the cost of or liability for the consequences of one's own negligence, provided it is done clearly and unambiguously." *Eastern Airlines*, 758 F.2d at 135 (citing *Beloit II*, 757 F.2d at 1430). No Virgin Islands cases were examined. No Virgin Islands statutes were considered, even though the court acknowledged that "in some jurisdictions, 'a provision which guarantees indemnification for the sole negligence of the indemnitee is void as against public policy.'" *Eastern Airlines*, 757 F.2d at 134 (quoting *Harbenski v. Upper Peninsula Power Co.*, 325 N.W.2d 785, 791 (Mich. Ct. App. 1982); (citing *Chicago & Nw. Transp. Co. v. V & R Sawmill, Inc.*, 501 F. Supp. 278 (D.S.D. 1980)). Without citing any Virgin Islands case law, statutes,

rules, or regulations to support its decision, the Third Circuit found no public policy barring judicial enforcement of sole negligence contracts. *Contra Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 357, 51 S. Ct. 476, 477-78 (1931) ("In determining whether the contract here in question contravenes the public policy of Arkansas, the *constitution, laws and judicial decisions of that State and as well the applicable principles of the common law are to be considered.* Primarily it is for the lawmakers to determine the public policy of the State." (emphasis added)); *accord Bloch v. Bloch*, 9 V.I. 554, 558 (3d Cir. 1973) ("'I find nothing in the statutory or decisional law in the Virgin Islands to indicate that a common law marriage, even if prohibited, is against the public policy of this forum.'" (citation omitted)). The Third Circuit did not attempt to identify the best approach for the Virgin Islands. *Contra Gomes v. Brodhurst*, 394 F.2d 465, 469 (3d Cir. 1967) (relying on state supreme court decisions to modify Virgin Islands common law ); *accord Gov't of the V.I. v. Parrilla*, 29 V.I. 353, 370 (3d Cir. 1993) (Becker, C.J., dissenting) ("[W]e serve here as the equivalent of a state supreme court (for the Virgin Islands)."). It is this failure to consider what the common law of the Virgin Islands *should* be that undermines *Beloit* and *Eastern Airlines.*

¶68 Again, the Court agrees that the soundest rule for the Virgin Islands is to recognize a cause of action for breach of an indemnification agreement. And, whether an indemnification agreement covers A's negligence, B's negligence, or A through Z's negligence is for the contracting parties to decide. But "specificity is not too onerous a burden." *Damidaux*, 1981 U.S. Dist. LEXIS 10733 at *6. And if, as discussed further below, the question whether "in contract indemnity cases . . . actual liability is a prerequisite to the duty to indemnify," can only be "answered by reference to what the parties, by virtue of their contractual capacity, intended, as reflected in the language of the indemnity clause," *Bainville* 837 F.2d at 131 (emphasis omitted), then the parties must be clear in drafting their agreements. An indemnification agreement is a contract and Virgin Islands public policy favors clarity and simplicity in contracts. *Cf.* 12A V.I.C. § 252 ("A consumer contract . . . shall be written in clear, simple, understandable and easily readable language."); *Cacciamani & Rover Corp. v. Banco Popular de P.R.*, 61 V.I. 247, 253 (2014) ("[H]old the parties to a contract to the terms of their agreement."). As the Court of Appeals of the District of Columbia reasoned, indemnification agreements have to be

> narrowly construed by the courts so as not to read into them any obligations the parties never intended . . . [and i]f parties seek to provide indemnification not just for the actions of the indemnitor, but also for the actions of the indemnitee, so that the indemnitee would be entitled to full reimbursement . . . when the indemnitee

> is itself negligent, the criterion is even stricter. In order to find that a party
> contracted away its own liability by receiving full indemnity therefor, there must
> be a clear intention to do so that is apparent from the face of the contract . . . .

*Rivers & Bryan, Inc. v. HBE Corp.*, 628 A.2d 631, 635 (D.C. 1993) (quotation marks, citations, and alteration omitted). Consequently, this Court agrees with the Hess Plaintiffs "that parties' contractual limitations on liability should be enforced," (Hess Pls.' Supp. Br. 7), so long as the limitations on (and assumptions of) negligence are made clear in that contract. Clearly, however, this is a controlling question of law "as to which there is substantial ground for difference of opinion," 4 V.I.C. § 33(c), so the Court will certify it to the Supreme Court of the Virgin Islands. "[A]n immediate appeal . . . [will] materially advance the ultimate termination of litigation," *id.*, both in the *Catalyst* cases and hundreds of other asbestos cases. *Cf. Hess Oil V.I. Corp. v. Fluor Daniel*, 2020 VI Super 50, ¶ 56 (noting that "'the impact that an appeal will have on other cases is a factor [courts] . . . take into account in deciding whether'" to certify or accept questions of law (citation omitted)).

¶69  The last question to address is whether the indemnitee must show actual liability to trigger a contractual duty to indemnify, or is showing potential liability sufficient? *Cf. Frederick*, 22 V.I. at 145 ("[W]hether an indemnitee, such as HOVIC, need only show potential liability to recover from an indemnitor"). The Hess Plaintiffs contend that a jury could not have found them solely negligent because IMC also owed a duty to its own employees and any bystanders. In addition, Plaintiffs sued Shell, UOP, and American Cyanamid. Since Hess and HOVIC would not have been found "solely negligent" for any Plaintiff's alleged injuries, IMC must indemnify them. This too requires a *Banks* analysis.

¶70  Turning to the first factor, Virgin Islands courts were prolific here too. And the first case to address actual-versus-potential in some depth was *Dominic*, 624 F. Supp. at 118. Leonard Dominic had fainted and injured himself while working with a chemical solvent at the oil refinery. *Id.* He was employed by Communication Systems & Maintenance Corporation ("CS&M"), who, in a purchase order with HOVIC, had agreed to

> indemnify, hold harmless and defend HOVIC and its affiliates, successors and
> assigns . . . from and against any and all demands, liability, losses, damages and/or
> expenses . . . by reason of injury . . . or damage . . . arising out of or in any manner
> connected with the operation to be performed under this purchase order, whether
> or not due in whole or any part to any act, omission or negligence of HOVIC . . . or
> by any other person.

*Id.* at 118-19. CS&M had also agreed to indemnify HOVIC "notwithstanding and regardless of"

title 4, section 1451 of the Virgin Islands Code, regarding apportionment of liability. *See id.* After Dominic sued HOVIC, HOVIC issued a demand letter to CS&M, which CS&M rejected. *See id.* at 119. Discovery later revealed that Shell might bear some responsibility, so Dominic "promptly added Shell as a defendant." *Id.* HOVIC, in turn, brought CS&M into the case by third party complaint on a contractual indemnification claim and then moved for summary judgment. HOVIC and Dominic eventually settled for $50,000. *See id.* CS&M declined to weigh in on whether the amount was reasonable. *See id.* In granting summary judgment in favor of HOVIC, the District Court rejected CS&M's argument about what affirmative defenses HOVIC should have pled, explaining that

> the duty to defend comes into play if the allegations of the complaint "state on their face a claim which potentially applies." Had CS&M met its initial obligation to take over the defense of HOVIC, there is no question it would be entitled to dictate litigation strategy and raise such defenses as it considered appropriate. By failing to even defend, however, we find that CS&M is estopped from criticizing HOVIC's strategy as a means of escaping obligations under the indemnity agreement. . . . It ill befits CS&M to carp at HOVIC over the manner in which it defended itself, after violating its contractual duty . . . in the first instance.

*Id.* at 120 (ellipses and citations omitted) (quoting *C.H. Heist Caribe Corp.*, 640 F.2d at 483). But CS&M could raise "issues of liability and reasonableness," *id.*, the court concluded.

¶71     Regarding liability, the court found it "difficult to ascertain whether HOVIC was *actually* liable to Dominic, since it contested liability until settlement, and no fact finder made a determination in that regard." *Id.* "HOVIC was *potentially* liable to Dominic as the possessor of land," *id.*, the court reasoned. But "whether an indemnitee, such as HOVIC, need show only potential liability to recover from an indemnitor, such as CS&M," *id.* at 121, that was unclear. Relying on Chief Judge Seitz's dissent in *Frederick*, the court reasoned that

> [s]ome courts have adopted an exception to the general rule and allowed the indemnitee, who settles with the injured party, to secure indemnification upon proof of only potential liability. But, to fall within this category . . . the indemnitee (HOVIC) would have to offer the indemnitor (CS&M) the choice of either approving the settlement or taking over the defense. Since HOVIC tendered the defense and it was rejected, the inference is clear . . . proof of only potential liability [will] suffice.

*Id.* at 121 (citing *Frederick*, 642 F.2d at 56 (Seitz, C.J., dissenting)) (citations omitted). As for whether the amount HOVIC settled for was reasonable, the District Court gave that question little time. *See id.* ("HOVIC acted reasonably in cutting its losses for $ 50,000.").

¶72     The District Court reaffirmed *Dominic* in *Firemen's Fund, see* 22 V.I. at 145, and again in

*Bainville*, reiterating that "an indemnitee seeking indemnification after settling with a plaintiff need only show potential liability in order to recover from the indemnitor." 22 V.I. at 451 (comma omitted) (hereinafter *"Bainville I"*). Robert Bainville worked for Standby Power Supplies. *Id.* at 452. Standby had an agreement to indemnify HOVIC unless the "liability, claim, demand or cause of action [was] attributable solely to the negligence of" HOVIC. *Id.* Bainville was injured while working at the refinery and sued HOVIC. *See id.* HOVIC "tendered the defense to Standby [but] Standby refused." *Id.* HOVIC brought Standby in on a third-party complaint for contractual indemnification and moved for summary judgment. *See id.* The court withheld ruling pending the outcome of the first-party litigation. *See id.* HOVIC and Bainville continued settlement discussions and reached an agreement but allowed the jury to return a verdict so that liability was determined. *See id.* The jury found Bainville and HOVIC each fifty percent at fault and, further, that Bainville was HOVIC's borrowed employee. *Id.* at 453.

¶73 Relying on the verdict to oppose summary judgment, Standby argued that "the jury's finding that Bainville was the borrowed servant of HOVIC imputes Bainville's negligence to HOVIC under principles of *respondeat superior* so that Bainville's injuries were attributable *solely* to the negligence of HOVIC." *Id.* at 453 n.4 (emphasis added). In other words, Bainville's and HOVIC were one and the same. The District Court disagreed but declined to address the imputed liability. Instead, the court applied *Firemen's Fund* and *Dominic* and concluded that, because HOVIC was *potentially* liable when HOVIC tendered the defense and Standby rejected it, HOVIC could seek indemnification even after the jury returned its verdict. *See id.* at 453-54.

> [W]hen HOVIC, faced with the potential liability of Bainville's claim, offered Standby the opportunity to accept Bainville's $200,000 demand, Standby had only three choices in the context of this case. It could: 1) accept the offer; 2) take over the defense and hold HOVIC harmless; or 3) reject the offer and breach its agreement. By rejecting the offer, Standby failed to uphold its bargain to hold HOVIC harmless. Consequently, Standby may not be heard to complain at the outcome, for what occurred thereafter, occurred at its peril.

*Id.* at 454-55 (quotation marks and citation omitted).

¶74 On appeal, the Third Circuit affirmed. *See* 837 F.2d at 129 (hereinafter *"Bainville II"*). Whether actual or potential liability must be shown before indemnification is triggered, the court's answer was, it depends on the type of indemnification at issue.

> Contractual indemnity clauses are typically drafted to cover the circumstances created by agreements between the companies which contract out jobs and general contractors which perform them . . . . As such, the duty's scope, in particular its applicability to stipulated judgments, is determined by the parties'

mutual intent, expressed in the contract, rather than by general principles of equity. It is well-settled that parties can allocate the financial responsibility for the consequences of negligence as they see fit. This capacity to shift financial responsibility by contract naturally includes the capacity to contractually allocate financial responsibility for stipulated judgments where cases are settled without the benefit of an adjudication of actual liability. Thus, in *contract* indemnity cases, as distinguished from cases where liability arises as a matter of law, the question of whether actual liability is a prerequisite to the duty to indemnify is answered by reference to what the parties, by virtue of their contractual capacity, intended, as reflected in the language of the indemnity clause.

This method of determining if the duty encompasses payments based on potential, as opposed to only actual, liability, contractual interpretation, is entirely different from the approach propounded by Chief Judge Seitz in *Frederick*. . . . In Chief Judge Seitz's approach an actual liability requirement is assumed to be the general rule, from which a "potential liability exception" is made on the basis of weighing the policy interests in encouraging settlements . . . against considerations of fairness to the putative indemnitor. Other courts have further elaborated the circumstances in which such a potential liability exception should apply, specifically, when the indemnitor has had the opportunity either to take over the defense of the original action or approve the terms of the settlement, or, more broadly, when the indemnitor has been substantially protected against the awkward possibility of having to prove the original plaintiff's case against himself. This court, while not having committed itself, has signaled some inclination toward adopting this balancing-of-the-equities formula as a guide to when to recognize exceptions to the general rule of an actual liability requirement.

It must be emphasized, however, that the balancing-the-equities approach applies only to cases where the duty to indemnify arises as a matter of law. Balancing the interest in promoting settlements against considerations of fairness to the indemnitor is simply irrelevant to the determination of whether a contractual duty to indemnify requires a demonstration of actual liability as a precondition or whether, alternatively, an assertion of potential liability is sufficient to trigger the duty. That determination, according to elementary principles of contract law, is clearly a matter of the intent of the parties.

*Id.* at 130-31 (citations omitted). After *Bainville II* held that the language of the contract governs, Virgin Islands courts no longer questioned actual or potential liability, presuming Third Circuit precedent to be binding.

¶75    Turning to the second factor, most courts generally agree with *Bainville II*, "'that in the area of *contractual* indemnity an application of the theories of active or passive as well as primary or secondary negligence is inappropriate.'" *Parfait v. Jahncke Serv., Inc.*, 484 F.2d 296, 303 (5th Cir. 1973) (emphasis added) (quoting *Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc.*, 355 U.S. 563, 569 (1958)). Because "'[i]ndemnity may arise either in contract

or in tort,'" *id.* (quoting *Gen. Elec. Co. v. Cuban Am. Nickel Co.*, 396 F.2d 89, 90 (5th Cir. 1968)), the actual-versus-potential liability problem is restricted to indemnification based on tort, not contract. And "[t]he actual-versus-potential liability problem is unique to cases in which the original defendant (indemnitee) has settled with the original plaintiff without giving the third-party defendant (indemnitor) an opportunity to approve the amount of the settlement or to conduct the defense . . . ." *Id.* at 304. But not all courts agree.

¶76   The Supreme Court of New Hampshire illustrated several concerns courts have with actual versus potential liability in *Morrisette* v. *Sears, Roebuck, & Company*, 322 A.2d 7 (N.H. 1974). Morrisette sued her sister-in-law, Przybyla, when a lawn mower injured her. *See id.* at 8. Przybyla brought Sears into the suit on a third-party complaint. *See id.* Halfway through trial, the sisters-in-law settled. The judge refused to go forward on the third-party claims and certified several questions for interlocutory appeal. *See id.* Addressing what the burden of proof is for a defendant/third-party plaintiff after settling with the first-party plaintiff, the New Hampshire Supreme Court explained that "[s]ome cases adopt a less precise statement that one voluntarily paying a claim 'should be required to show that he was legally liable for it.'" *Id.* at 9 (quoting *Ashland Oil & Refining Co. v. General Tel. Co.*, 462 S.W.2d 190, 193 (Ky. 1970)). However, "[o]ther cases say that the third-party plaintiff must 'establish potential liability' but need not prove the case against himself." *Id.* (citing *St. Paul Fire & Marine Ins. Co. v. Michelin Tire Corp.*, 98 N.E.2d 289 (Ill. Ct. App. 1973)). The real concern, however, was encouraging settlement while preserving the right to challenge it.

> If a third-party plaintiff is not to be discouraged from making a settlement his burden in an action for indemnity must not be too great. He would in effect be forced to proceed to trial against the original plaintiff . . . and would find settlement to little advantage. On the other hand, equitable considerations require that the third-party defendant have a reasonable opportunity to show that the third-party plaintiff was not liable to the original plaintiff but paid the claim as a volunteer.

*Id.* at 10. *Morrissette* turned to the three-part test recognized by *Parfait* to hold "that if it appears that Sears was not afforded the alternative of participating in the settlement or conducting the defense, then Morrissette will have the burden of establishing her *actual* liability to Przybyla rather than the lesser burden of showing *potential* liability." *Id.* at 11 (emphasis added).

¶77   Although *Morrisette* concerned equitable, or common law, indemnification, not contractual indemnification, courts continue to rely on the factors it identified, even for contractual indemnification claims. *See, e.g., MT Builders, L.L.C. v. Fisher Roofing, Inc.*, 197 P.3d 758, 769 (Ariz. Ct. App. 2008) ("[W]hen an indemnitee settles a lawsuit covered by an indemnity

agreement, it may obtain indemnity from its indemnitor if it gave the indemnitor notice of the action and an opportunity to defend and demonstrates the decision to settle was, under the circumstances, reasonable and prudent. If the indemnitee satisfies these conditions, it may obtain indemnity without having to show it was actually liable to the third person; it need only show its potential liability." (citations omitted)). For example, in *Valloric v. Dravo Corporation*, 357 S.E.2d 207, 211 (W. Va. 1987), the Supreme Court of West Virginia held that the "issue of whether actual or potential liability must be shown depends on whether the indemnitor . . . had actual notice of the underlying claim, an opportunity to defend it, and the right to participate in any settlement negotiations." The court characterized these factors as "prerequisites for an indemnitee to have the benefit of the potential liability standard along with the further element that the settlement amount must be deemed to be reasonable in view of the potential liability." *Id.* In support, the West Virginia Supreme Court cited thirteen cases, federal and state, where courts applied this same three-factor test. *See id.* (collecting cases). Several of those cases involved contracts. *See, e.g., Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1216 (5th Cir. 1986) ("The District Court held that Mesa was not entitled to contractual indemnity from Bristow because Mesa could not establish that it was potentially liable to Fontenot when it settled the plaintiff's claim."); *Burlington Northern, Inc. v. Hughes Bros., Inc.*, 671 F.2d 279, 283 (8th Cir. 1982) ("When liability under an indemnity contract has been denied by the indemnitor, proof of actual legal liability to the injured party is not a requirement."); *Morris v. Schlumberger*, 445 So .2d 1242, 1246 (La. Ct. App. 1984) ("The indemnity clause in question is silent on the issue of tender and notification, therefore, equitable principles of indemnity apply."); *Fireman's Fund Ins. Co. v. Comm. Standard Ins. Co.*, 490 S.W.2d 818, 824 (Tex. 1972) ("Some jurisdictions require that the indemnitee prove actual rather than potential liability to the plaintiff with whom he has settled before he can recover the amount of the settlement from the indemnitor. This rule obviously is a discouragement to settlements of cases when there is a future indemnity suit yet to be tried. Texas does not follow this rule."); *see also Horn Constr. Co., Inc. v. MT Sec. Serv. Corp.*, 489 N.Y.S.2d 254, 255 (App. Div. 1985) ("[W]e find that Horn has met its burden of proving that the settlement it entered into of the underlying action was reasonable. Moreover, ample evidence exists to support the jury's finding that Horn could have been found liable had it proceeded to trial in the underlying action.").

¶78    Turning to the third factor, it is not clear that litigants and courts in the Virgin Islands have come to rely on *Bainville II*. The District Court of the Virgin Islands has. *E.g., Hess Oil V.I.*

*Corp. v. Ingersoll-Rand Co.*, Case No. 03-0147, 2005 U.S. Dist. LEXIS 50921, *4 (D.V.I. Oct. 21, 2005); *see also Sullivan v. Sabharwal*, Case. No. 2016-21, 2018 U.S. Dist. LEXIS 41941, *4 (D.V.I. Mar. 14, 2018). But no decisions of the Territorial or Superior Courts of the Virgin Islands have cited *Bainville II*. Clearly Hess and HOVIC have come to rely on *Bainville II*. (*See* Amended S.J. Mot. 6-7 ("The Third Circuit has *already* considered HOVIC's indemnification language to rule that it covers claims that contractor's employees assert against HOVIC." (emphasis added) (citing *Bainville II*).) But "the parties cannot stipulate to the law, especially . . . where the decision may impact other pending or future cases." *Matthew*, 56 V.I. at 682. And one concern with *Bainville II* is that the court rejected "the balancing-the-equities approach," 837 F.2d at 131, in favor of "the language of the indemnity clause," *id.*, but where the language was silent. The words "actual" and "potential" do not appear anywhere in the language of the indemnification clause excerpted in the opinion. *See id.* at 129 (quoting indemnification language). However, because "[t]he language of the contract [wa]s not limited to cases in which the indemnitee is found liable to the injured person," *id.* at 132, the Third Circuit saw "no reason to imply such a limit." *Id.* Instead, the Third Circuit inferred "potential liability" from "the intent of the parties." *Id.* at 131 ("We have no trouble concluding that here the intent of the parties was not to require a determination of actual liability as a precondition of the duty to indemnify."). But courts only turn to "the subjective intent of the parties . . . where the documents are ambiguous or incomplete and, in such circumstances, the court's determination of the unexplained subjective intent is a finding of fact." *Sun Oil Co. v. Comm'r of Internal Revenue*, 562 F.2d 258, 262 (3d Cir. 1977). And "where there is ambiguity, the words are construed against the drafter." *In re: Cmty. Med. Ctr.*, 623 F.2d 864, 866 (3d Cir. 1980) (applying New Jersey law). Yet, no facts were found in *Bainville II* because the District Court granted summary judgment. *See* 837 F.2d at 129 ("Since we review a summary judgment our review is plenary,"). In reality then, the language of the contract did not control.

¶79    Insofar as the indemnification language at issue here is the same as that "already considered" in *Bainville II*, (Hess Pls. Amended S.J. Mot. 6), this Court has concerns about "hold[ing] as a matter of law," *id.* at 7, that Hess and HOVIC only have to show potential liability and declines to follow *Bainville II*. Hess and HOVIC seem to believe the Third Circuit was interpreting a statute. *See id.* at 13 ("The Third Circuit has already considered HOVIC's indemnification contracts and ruled that the broad language contained therein, such as 'any suits, claims, demands, judgment or causes of action for personal injury,' evidences the intent by the contracting parties to condition indemnification on HOVIC and Hess' potential liability, not

actual liability." (quoting *Bainville II*, 837 F.2d at 131)). Hess and HOVIC may argue that *Bainville II* put IMC on notice of what *HOVIC* understood the language to mean. But *Bainville II* is not controlling on the agreements between HOVIC and IMC. The agreements are silent. The words "actual" and "potential" do not appear in either agreement

¶80    Having considered the positions of other jurisdictions, this Court believes the Louisiana approach is the soundest rule for the Virgin Islands. "[W]hen the basis for indemnity is a written contract or when the indemnitee tenders to the indemnitor its defense of the underlying lawsuit, the indemnitee need only prove potential liability and the reasonableness of any ensuing settlement." *Chevron Oronite Co., LLC v. Jacobs Field Servs. N. Am., Inc.*, Civ. No. 18-2799, 2018 U.S. Dist. LEXIS 174194, *10 (E.D. La. Oct. 10, 2018) (citing *Vaughn v. Franklin*, 785 So. 2d 79, 87 (La. Ct. App. 2001)); see also *id.* at *9 n.33 (noting that Louisiana's framework is "virtually identical" to that apply by federal courts in the Fifth Circuit in maritime law). "[E]quitable principles of indemnity [also] apply when the contract is silent . . . ." *Id.* "When a contract is silent . . . a court should not remedy the deficiency by divining from its crystal ball the drafter's intent." *Pasteur Health Plan v. Salazar*, 658 So. 2d 543, 544 (Fla. Dist. Ct. App. 1995). And "[w]here . . . a contract is negotiated by sophisticated parties at arm's length: [C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include. Hence, courts may not by construction add or excise terms, nor distort the meaning of those used . . . under the guise of interpreting the writing." *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 302 (S.D.N.Y. 2010). Again, "specificity is not too onerous a burden." *Damidaux*, 1981 U.S. Dist. LEXIS 10733 at *6. If parties want to agree that indemnification should be limited to a showing of actual liability, they can make that clear in their contract.

¶81    Applying this standard, the Court cannot find in favor of the Hess Plaintiffs. First, it is unclear if Hess' and HOVIC's contractual indemnification claims also includes a claim for attorney's fees due to IMC not having taken over the defense of 49 the 87 lawsuits. "[T]he duty to defend and the duty to indemnify are separate." *Firemen's Fund*, 22 V.I. at 143. And "[d]ifferent elements of proof are required to establish a breach of each obligation." *C.H. Heist Caribe Corp.*, 640 F.2d at 481. In their motion papers, the Hess Plaintiffs state they sent a demand letter to IMC on December 11, 2008, to take over the defense of the eighty-seven lawsuits. (*See* Hess Pls.' Amended S.J. Mot. 2.) They also state that IMC refused that demand and this third-party action ensued. *See id.* at 3. But assertions of counsel are not evidence. *See Walters*, 60 V.I. at 775 n.7. Because the Hess Plaintiffs did not submit copies of the demand and rejection letters in support,

the Court cannot find that the potential liability standard announced above applies here.

¶82    Second, and contrary to the Hess Plaintiffs' assertions, the present record shows material facts in dispute. Regarding the 49 Plaintiffs who form the basis for Hess and HOVIC's contractual indemnification claims against IMC, 43 Plaintiffs worked for IMC for different lengths of time. For example, John Bully, whose case was selected for trial, stated in his deposition that he was employed by IMC from 1986 to 1992, that he worked with catalyst, and that he sometimes wore a mask for protection. (*See* Hess Pls' Amend. S.J. Mot., Ex. U (Dep. of John Bully, 118:7, 21, 117:5-7, 117: 16-18 (Aug. 26, 2008)).) But Bully also worked for Litwin from 1974 to 1975 and Litwin Panamerican Corporation from 1979 to 1986, working with catalyst and wearing a mask if available. *See id.* at 113:8-18, 186:21-25. Presumably, if Bully's complaint limited his claims to exposure to catalyst dust from 1986 to 1992 only, then the Court could conclude that the 1986 purchase order might be triggered here. But all Plaintiffs, including Bully, named Litwin as a defendant, and most alleged that they worked with catalyst for several years, even decades. (*See* Hess Pls.' Amend. S.J. Mot., Ex. V1 (Compl. ¶ 13, filed Dec. 28, 2005, *Alick Lockhart v. Hess Oil V.I. Corp., et al.,* SX-05-CV-850) ("Plaintiff performed this work [handling catalyst] from the mid 1970s to 2001.")); *accord id.* at Ex. O2 (Compl. ¶ 13, filed Dec. 28, 2005, *Skennny Sylvester v. Hess Oil V.I. Corp., et al.,* SX-05-CV-827 ("Plaintiff worked at the refinery from 1976 until 2002.")).)

¶83    Regarding the 6 Plaintiffs, HOVIC contends that, even though they were not employed by IMC, they were still "indirectly exposed to catalyst dust while IMC was performing catalyst work" at the refinery. (Hess Pls' Amend. S.J. Mot. 6.) Presumably the 1994 agreement covers the 6 Plaintiffs' claims, while the 1986 purchase order covers the 43 Plaintiffs' claims, but that is not clear.[23] Both agreements condition indemnification on injuries being caused, or allegedly caused, by some act, omission, or negligence of IMC (including IMC's employees). Hess and HOVIC did not submit any evidence to show what duties IMC agreed to perform under the 1986 purchase order and the purchase order, itself, states only that IMC will "provide labor and services as required by HOVIC and SCPC." (Hess Pls.' Amend. S.J. Mot., Ex. C., Purchase Order (dated July 28, 1986).) A letter dated July 28, 1986, the same date as the purchase order, modified the terms of the indemnification agreement. It appears IMC accepted the modification on August 4, 1986. (*See*

---

[23] The record further shows (in exhibits C through G) that the monetary limits under the 1986 purchase order were adjusted from time to time by the parties, which in turn raises a related question whether HOVIC is limited to the monetary limit that was in place during the years when the plaintiff worked for IMC, or whether HOVIC can invoke the coverage limits the parties last agreed to.

1986 Letter at 2.) But the duty to indemnify still extended only to acts or omissions "in connection with, or incident to, performance of the purchase order." *Id.* at 1. And the purchase order does not state what duties IMC agreed to perform. The 1994 maintenance services agreement has similar language, providing that IMC will "defend, indemnify, and release HOVIC" for "any act, omission or negligence, whether active or passive, of [IMC] . . . ." (1994 Maint. Servs. Agmt ¶ 11.1, p. 8.) But HOVIC and IMC also agreed, according to Schedule A attached to the 1994 agreement, that IMC would also "[p]rovide managerial, supervisory, technical and craft labor" in addition to turnaround field execution, painting, and power generation maintenance, as well as administrative and clerical duties among other services. (*See* 1994 Agreement, Sch. A.) Even if the Court did not depart from Third Circuit precedent, the Court still cannot determine from the record whether any of the 49 Plaintiffs' lawsuits triggered the 1986 purchase order, the 1994 service agreement, or perhaps both. *But cf. Frederick*, 17 V.I. at 532 ("As between two inconsistent contracts the one later in time will prevail over the earlier contract.").

¶84    Finally, and perhaps most importantly, HOVIC may have drafted the language in the 1986 purchase order and the 1994 agreement in reliance on Third Circuit precedent. Courts have recognized that "'[t]he judicial overruling of a precedent should not be given retroactive effect where this would interfere with rights, especially contractual rights, duly acquired pursuant to the law as it prevailed prior to the overruling decision.'" *De Martino v. Zurich Ins. Co.*, 307 F. Supp. 571, 573 (W.D. Pa. 1969) (quoting 20 Am. Jur. 2d Courts § 235)). Because the Court's decision could significantly delay, rather than "materially advance the ultimate termination of litigation," 4 V.I.C. § 33(c), if the Supreme Court of the Virgin Islands were to agree with *Bainville II*, or find that it was binding, the Court will also certify for interlocutory appeal the question whether actual or potential liability must be shown when an indemnification agreement is silent. For these reasons, the Court finds that the Hess Plaintiffs' summary judgment motion is premature, even though IMC has not responded yet.

¶85    There is one more reason why summary judgment must be denied: concern over the posture of the third-party action. What Hess and HOVIC seek to recover through their contribution and indemnification claims is the monies they paid out to settle with eighty-seven individuals. Through the instant motion, they seek summary judgment against IMC on Count Four, contractual indemnification, but only for 49 of the 87 lawsuits. Summary judgment cannot be granted on fractions of a claim. In other words, the Court cannot enter judgment in favor of HOVIC or Hess on $^{49}/_{87}$ of Count Four and only as to one of seventeen Third-Party Defendants

named in that count. What the amended motion highlights is that Hess and HOVIC have each asserted 87 contractual indemnification claims, 87 common law indemnification claims, and 87 contribution claims—in addition to their claims for breach of the duty to obtain insurance and breach of the duty to name them as an insured. Having all these claims plead *en masse* in one third-party complaint filed in a master case underscores the herculean task that awaits any fact-finder who must parse the evidence that will be presented by two third-party plaintiffs to prove six claims apiece against multiple third-party defendants, including some yet be added to this litigation. Clearly, Hess' and HOVIC's motion must be denied without prejudice at this time.

### C.      Motion for Leave to File Second-Amended Third-Party Complaint

¶86     The last motion before the Court is the Hess Plaintiffs' motion, filed on June 21, 2011, for leave to amend their amended third-party complaint. The reason for the motion is "to add ICI Americas, Inc. as an additional Third Party Defendant and to clarify that Counts Four and Five apply to the catalyst manufacturers." (Hess Pls.' Mot. to File Second Amend. Third-Party Compl. 1, filed June 21, 2011 (hereinafter "Amend Mot.").) At the time the Hess Plaintiffs filed their motion, "amendments to pleadings were governed by Superior Court Rule 8, which 'allowed a pleading to be amended at any time during a civil proceeding.'" *Martinez v. Hess Oil V.I. Corp.*, 69 V.I. 519, 528 (Super. Ct. 2018) (brackets and citation omitted). "'[G]ranting leave to amend is reposed in the sound discretion of the trial court' and 'when justice so requires is the mandate.'" *Id.* (citation omitted). "Leave to amend need not be granted, however, if granting leave to amend would be futile." *Id* at 529 (citing *Cacciamani & Rover Corp. v. Banco Popular de P.R.*, 61 V.I. 247, 255 n.5 (2014)). And "futility has been upheld 'when the relief requested in the amended complaint was not authorized under Virgin Islands law . . . .'" *Id.* (quoting *Adams v. N. W. Co., Inc.*, 63 V.I. 427, 453 (Super. Ct. 2015)).

¶87     In their motion, the Hess Plaintiffs give the following reason for seeking leave to amend to add another third-party defendant:

> Through our investigative efforts, we discovered that Katalco Corporation merged with ICI Americas, Inc. and ceased to exist in 1986 as a result of the merger. The discovery records indicate that Katalco Catalyst was used at the HOVIC Refinery between 1975 and 1986. Based on this evidence, HOVIC and Hess believe that Indopco, Inc. and/or ICI Americas, Inc. assumed Katalco Corporation's liability with regard to its catalyst used at the HOVIC Refinery.

(Hess Pls.' Amend Mot. 2.) Additionally, they want "to resolve the confusion" and make it clear that count four, contractual indemnification, and count five, breach of contract claim for failure to obtain insurance, do "apply to the catalyst manufacturers." *Id.* at 4. Since "this matter has not

been case managed by the Court and only limited discovery has been exchanged," the third-party defendants would not be prejudiced, the Hess Plaintiffs contend. *Id.* at 3. For this reason, and because the "'ends of justice will be promoted,'" *id.* (quoting *Choate v. Skinner*, 19 V.I. 399, 406 (Terr. Ct. 1983)), the Court should grant the motion and allow the amendment.

¶88   Only one third-party defendant, Axens North America, Inc. ("Axens") responded in opposition. But its opposition was rendered moot on July 5, 2016, when the Court (Willocks, J.), approved a stipulation for dismissal filed by Axens, Hess, and HOVIC. Axens' opposition is still noteworthy because it highlights the issues surrounding the posture of the third-party claims, namely which claims are pending and as to which third-party defendants.[24] Furthermore, with Axens now having been dismissed, the Court would have to reject the proposed second amended third-party complaint since it retains the claims against Axens. Rather than continue to perpetuate prior errors by allowing claims pertaining to all Plaintiffs whose cases was grouped under this master cases to be asserted in a "mass" third-party complaint filed in the master case, the Court will instead follow the approach taken by another Superior Court judge. *See generally In re: Kelvin Manbodh Asbestos Litig. Series*, 69 V.I. 394, 444-50 (Super. Ct. 2018).

¶89   Along the same lines as *Manbodh*, the Court will grant the Hess Plaintiffs' motion, but reject their proposed amended complaint. The Court will sever the Hess Plaintiffs' claims and order them to refile one third-party complaint within each Plaintiff's case and name as third-party defendants in each complaint only those companies whom the Hess Plaintiffs' claim that specific first-party plaintiff may have been liable. *Accord In re: Refinery Dust Claims*, SX-06-CV-78, 2016 V.I. LEXIS 48, *18-19 (V.I. Super. Ct. May 3, 2016) ("Thus, the Court believes that it will be cleaner and clearer for the record for Defendant HOVIC and Defendant Hess to file a third-

---

[24] In its response, Axens, a manufacturer of catalyst, opposed leave, but only because the Hess Plaintiffs "should be seeking to amend their complaint to *remove* Axens, instead of trying to retrench Axens in this litigation." (Def. Axens N. Am.'s Opp'n to Hess Pls.' Mot. 8, filed July 7, 2011 (emphasis added).) According to Axens, the Hess Plaintiffs are on record stating that their contribution claim (count one) and their failure to insure claim (count five) "were not applicable to Axens and were subject to dismissal." *Id.* at 5. Axens is correct. Axens attached to its opposition a response the Hess Plaintiffs had filed on December 14, 2009, in opposition to Axens' October 23, 2009 motion for summary judgment. In their December 14, 2009 response, the Hess Plaintiffs conceded that "Axens' request to dismiss [sic] Count Five (breach of contract-failure to insure) [wa]s moot because Count Five does not apply to *any of the third party catalyst manufacturers*, including Axens." *Id.* at Ex. D (Hess Pls' Resp. in Partial Opp'n to Axens N. Am.'s S.J. Mot. 3.) Yet, now in seeking leave to amend, the Hess Plaintiffs want to make the opposite clear. Axens claims the Hess Plaintiffs delayed for "six years," *id.* at 7, and their motion "is nothing but a bad faith attempt to further delay this case and to avoid an adverse summary judgment ruling in Axens' favor." *Id.* In reply to Axens, the Hess Plaintiffs, attempt to assure both the Court and Axens "that they are not attempting to thwart" Axens' summary judgment motion or "resurrect" their contribution or breach of contract for failure to obtain insurance claims against Axens. (Hess Pls.' Reply to Axens N. Am.'s Opp'n 3, filed July 14, 2011.) Although Axens was dismissed, its opposition highlights concerns with managing all the parties and claims here.

party complaint under each plaintiff's individual docket and only implead third-party defendants that they allege are liable (on a contribution and/or indemnification claim) for all or part of that specific plaintiff's claims against Defendant HOVIC and Defendant Hess."), *vacated on other grounds by* 2019 VI Super 170.

¶90     The cases grouped under this master case have not been closed, technically, because Plaintiffs' claims against Litwin have not been dismissed. But none of the first-party plaintiffs or defendants will be able to appeal if the third-party litigation continues for several more years. To ensure the parties' appellate rights, the Court will sever the individual claims but require the first-parties (Plaintiff, Hess, HOVIC, UOP, American Cyanamid, and Litwin) to file a notice in each case, jointly if possible, stating whether they intend to appeal any orders issued in the individual cases in the master case. The Court will further order Litwin and each Plaintiff to reduce their dismissal to writing. If any party indicates an intent to appeal, the Court instead direct Hess and HOVIC to file eighty-seven first-party complaints. Furthermore, and notwithstanding severance, the Court will direct the parties to meet and confer and submit a proposed case management order to govern discovery. Discovery should not be delayed while counsel reorganize their pleadings.

¶91     Assuming the third-party claims will proceed within the first-party cases, the Court will also   direct the Clerk's Office to assign a new number to Mr. Aarndel's case and refile and re-docket all papers specific to his claims under that new case number. *See Manbodh*, 69 V.I. at 394 n.3 ("'A master case should not share the same case number as one of the individual cases in the event that the individual case is terminated prior to the termination of the remainder of the litigation." (brackets omitted) (quoting *In re: Alumina Dust Claims*, 67 V.I. at 196)). Whether eighty-seven new complaints are filed or eighty-seven third-party complaints, the master case will remain in place to ensure the record is preserved and all motions remain pending. *See Albert v. Hess Oil V.I. Corp.*, 70 V.I. 316, 327 n.6 (Super. Ct. 2019) ("[S]everance . . . should not require the parties to re-file or re-brief pending motions.").

## III.   CONCLUSION

¶92     For the reasons stated above, the Court will grant Hess and HOVIC's motion for leave to file a second amended complaint but reject the proposed pleading because several third-party defendants have been dismissed and others dropped from this action. Furthermore, allowing third-party claims asserted by multiple third-party plaintiffs arising from eighty-seven individual lawsuits to be filed in a "mass" third-party complaint in a master case was in error. To

correct it, the Court will sever the third-party claims of Hess and HOVIC and order them to be refiled either in each individual case, so as long as the first-party litigants' rights of appeal would not be compromised. Otherwise, new complaints must be filed. The Court will also grant IMC's motion for leave to conduct discovery and direct the parties to meet and confer and submit a proposed a case management order to govern discovery in the third-party litigation. Finally, and notwithstanding that IMC requested a stay of summary judgment by moving for leave to take discovery, the Court will deny the Hess Plaintiffs' summary judgment motion without prejudice. The materials submitted show many facts in dispute. Moreover, this Court holds that the soundest rule for the Virgin Islands is to continue to recognize indemnification agreements but require explicit language when one party agrees to pass on their own negligence to another and further, where the language in an indemnification agreement is silent on whether actual or potential liability must be shown, to require proof of actual liability unless the indemnitee tendered the defense and it was refused. Lastly, since these questions are controlling, the Court will certify them to the Supreme Court of the Virgin Islands. Orders consistent with this Opinion follow.

**Date:** April 13, 2020

**ATTEST:**
TAMARA CHARLES
Clerk of the Court

By: _____
Court Clerk
Dated: _____4/13/2020_____

_____
ROBERT A. MOLLOY
Judge of the Superior Court